Abraham J. G-ellikoff, J.
As the result of various conveyances, leases, subleases and assignments, plaintiff Plaza Hotel Associates (Plaza) and defendant Wellington Associates, Inc. each own an undivided half interest in the land on which the Hotel Plaza, in New York City, is situated. In addition, Plaza is the lessee of defendant’s half interest in the land, and also owns the buildings and structures on the entire land. Plaintiff Hotel Corporation of America is a sublessee of the half interest in the land owned by defendant, as well as the lessee of the half interest owned by Plaza; and it is also- the operator of the hotel.
The controversy before the court pertains to the lease by defendant to plaintiff Plaza of defendant’s half interest in the land. Under article Two of that lease, Plaza is obligated to pay defendant an annual ground rental equal to 3% of the “ value ” on October 1, 1965, of “ all of the land,” exclusive of the buildings and improvements thereon. Under article Three defendant-is required to contribute a portion of all real estate taxes on the entire land, building’s and improvements — pursuant to a formula which takes into account the value of -all the land and the value of the land, buildings and improvements as a whole. The lease provides that if the parties are unable to agree on the value of the land, and the value of the land, buildings -and improvements as a whole, such values shall be determined by appraisers.
The parties were unable to agree on the values, and therefore conducted an appraisal, resulting in a valuation of $28,000,000 for the land only. The -appraisers made no valuation at all for the land, buildings and improvements as a whole. Thereafter, on motion by plaintiffs, this court set aside the -appraisers ’ valuation because the appraisers erroneously valued the land as vacant and available for its highest and best use, and not as already encumbered by the long term lease which restricts the use of the land to hotel purposes only (55 Misc 2d 483 [Sup. Ct., N. Y. County, 1967]).
After the Appellate Division-and the Court of Appeals affirmed this court’s judgment directing a new appraisal (28 A D 2d 1209 [1st Dept., 1967], affd. on opn. at Special Term, 22 N Y 2d 846 [1968]), the parties, unable to agree on new appraisers, stipulated that this court, sitting without a jury, pursuant to CPLR article 42, make a finding of the value of the land, and a separate finding of the value of the land, buildings and improvements as a whole, and thereby determine the rent payable by Plaza to defendant, and the proportion of real estate taxes to be contributed by defendant. The parties also consented to the appointment of a Referee to hear and report. The Referee’s *8 report is now before the court, together with motions by plaintiffs to reject, and by defendant to modify, the report. The court hereby makes the necessary findings pursuant to the stipulation, and the order entered thereon.
. The Plaza Hotel is, as the parties agree, a unique piece of property. It fronts on Grand Army Plaza, a public park, on the west side of Fifth Avenue, and occupies the entire block front between 58thStreet and 59thStreet (Central Park South), with a total plot area of 56,234 square feet. The hotel’s formal address is 768 Fifth Avenue. The main building situated at the corner of Grand Army Plaza and Central Park South, a 19-story and penthouse steel and stone fireproof structure, with basement and subbasement, was built in 1906-07, on a plot of 37,645 square feet. An addition, fronting on West 58th Street, was built in 1921, on a plot of 16,079 square feet. The seven-story annex at 22 Central Park South was built in 1921-1922 on a plot of approximately 2,500 square feet. The buildings have an aggregate content of 12,969,483 cubic feet.
On October 1, 1965 — the date as of which the property is to be valued — the hotel had approximately 990 rooms, about 946 of which were available for guest occupancy. A typical floor contained 67 guest rooms and 45 bedrooms. In the hotel buildings, there were also restaurants, dining rooms, social function rooms, stores, offices and showcase and concession space.
Defendant, through an affiliate, acquired its undivided half interest in the land as of October 1, 1965, by buying, and simultaneously exercising an option to purchase. This option entitled the holder to purchase an undivided half interest in the land by paying $400,000, and assuming one half of the unpaid mortgage indebtedness on the entire land. The option agreement also provided that when it was exercised, the optionee was required to execute and deliver the above-described lease of the half interest in the land to the then owner of the remaining half interest in the land, upon its request. This was done; Plaza, which already owned the remaining half interest in the land, thus also became lessee of defendant’s half interest in the land.
Defendant bought the option from Hilton Hotels Corporation for $3,600,000. The total price paid for acquiring the undivided half interest in the land, therefore, was roughly $5,000,000 — $3,600,000 paid for the option; $400,000 paid to the grantor, as provided in the option agreement; and $910,410.50, one half the then existing mortgage indebtedness, by assuming payment thereof.
*9 In order to find the value of the land, and the value of the land, buildings and improvements as a whole, the court must first determine what the contracting parties meant by “ value ”, The lease itself does not define what the parties intended the term to mean, nor does it prescribe the factors to be considered. Under the circumstances, however, including the provision for an appraisal, it must be presumed that the parties intended “ value ” to mean its fair value, sometimes referred to as “ market value”. (Cf. People ex rel. Parklin Operating Corp. v. Miller, 287 N. Y. 126 [1941]; People ex rel. Gale v. Tax Comm. of City of New York, 17 A D 2d 225 [1st Dept., 1962]; Matter of Kittelberger,4 A D 2d 218 [4th Dept., 1957].)
As the Appellate Division for the Fourth Department stated in Matter of Kittelberger (4 A D 2d 218, 222, supra): “ The phrase ‘ market value ’ in its legal sense has two meanings.” The first meaning is ‘ ‘ the price established by public sales or sales in the way of ordinary business.” The term is ¡also “ frequently used in a secondary .or figurative sense, meaning actual value, the fair or reasonable value ”; or, as the Court of Appeals has phrased it, ‘ ‘ .an estimate and a determination of what is the fair, economic, just and equitable value under normal conditions ” (Matter of Board of Water Supply of City of N. Y., 277 N. Y. 452, 459 [1938]).
Plaintiffs contend that since there was a sale of an undivided half interest in the land as of October 1, 1965, the very date as of which the valuation is required to be made, “ value ”, at least as to the land alone, is precisely twice the sale price of the undivided half interest. Alternatively, they argue, such sale price is entitled to “ overwhelming weight ” in determining the actual value of all the land. Defendant, however, contends that under the circumstances of the creation of the option and the purchase of the half interest, the purchase price therefor is not indicative of the true “ value ” of all the land. Obviously the parties did not intend that the “ value ” of the land for the purpose of determining the rent and tax contribution, should be arrived at by doubling the price paid for the undivided half interest, or the lease would have so provided; it would not have mandated that such “ value ” be determined by appraisers. In finding the value of all the land the court must take into consideration the price paid by defendant for its half interest, but should do so only to the extent warranted by all other factors involved.
Price and value are not synonymous. ‘ ‘ Price is determined by short term factors and by the caprices of the market. Value on the other hand is dependent upon long term factors and is *10 directly related to the intrinsic worth of the property that resists the impact of temporary and abnormal conditions. Neither price nor value can be determined by mathematical calculations, and value, even more than price, is a matter of judgment reached after a full consideration of all the relevant elements that may conceivably affect it ” (People ex rel. Buck v. Rapp, 36 N. Y. S. 2d 790, 796 [Sup. Ct., Monroe County, 1942], affd. 266 App. Div. 709 [4th Dept., 1943]). “ The concept of a fluid market such as that existing in regard to corporate securities, where one sale can indicate the value at the time, is just not true with respect to real estate ” (Matter of City of [New York [Lincoln Sq. Slum Clearance Project], 15 A D 2d 153,162 [1st Dept., 1961], affd. 12 NY 2d 1086 [1963]).
■Sometimes a selling price may be the best determinant of market value and be entitled to great or overwhelming weight. But, before relying on the selling price, the court must examine the circumstances of the sale — whether the transaction was conducted at arm’s length, and whether the sale was an ordinary one and thus reflective of true value, or abnormal and unusual and not reflective of actual value (see Matter of Board of Water Supply of City of N. Y., 277 N. Y. 452, supra; Heiman v. Bishop, 272 N. Y. 83 [1936]; People ex rel. Parklin Operating Corp. v. Miller, 287 N. Y. 126, supra; Matter of Lane Bryant, Inc. v. Tax Comm. of City of N. Y., 21 A D 2d 669 [1st Dept., 1964], affd. 19 NY 2d 715 [1967]).
As to whether the transaction for the acquisition of the undivided half interest was at arm’s length, the evidence is far from satisfactory. The option itself was created in 1953, when Hilton Hotels Corporation, then the owner of the entire hotel property, sold it to Park 59th Street Corporation. As part of the same transaction, Park leased back the entire property to Hilton, and gave Hilton the option to purchase a half interest in the land only, obligating the optionee, upon exercising the option, to execute to the then owner of the remaining half interest in the land — if it so elected — the specific lease now before the court. It was specified that the lease be for a term of 20 years, with an option to the lessee to extend the term for an additional 30 years. The option itself was exercisable no earlier than 12 years after it was granted, that is, only between October 1, 1965 and March 31,1966.
The Referee’s report does not expressly recommend that the court find the purchase to have been an arm’s length transaction, but instead it sets forth verbatim the testimony of Mr. Stanley Zax and Mr. Sol Goldman, who alone testified to the *11 transaction. Neither Mr. Hilton, nor Mr. Edward Lewis, of Brenner and Lewis, the broker responsible for the purchase of the option, nor any other person present at the conference at which the deal was made, was called as a witness; and, there is no explanation of the sudden drop in Hilton’s original asking price of $10,000,000 for the option. Hilton, who according to Sol Goldman, valued the entire land at about $28,000,000, lowered the asking price to $4,000,000 without any intermediate “ asked ” or “ bid ” prices. This substantial reduction immediately concluded negotiations between these two men, “ two of the most sophisticated real estate operators in the country ”, each with shrewd trading talent.
Also, the agreement for the purchase of the option seems to be a rather hastily drawn document for a transaction of this consequence. It is impossible to determine whether the representation ‘ ‘ the mortgage indebtedness on said property does not exceed $1,250,000 ” refers to the whole or only half the indebtedness. The whole mortgage indebtedness actually was $1,820,821, and there is no explanation for this substantial miscalculation, whichever portion of the indebtedness was. intended, on a matter which could have made a marked difference in the purchase price. Additionally, while the agreement bound the purchaser, it did not bind the seller except upon later ratification by the seller’s board of directors.
On the whole, therefore, while no inferences may be drawn from the failure to call the witnesses who could have shed light on the transaction (Hayden v. New York Rys. Co., 233 N. Y. 34 [1922]), the evidence as to whether the transaction was at arm’s length raises more questions than it resolves. However, since there is no direct evidence to the contrary, this court is constrained to find that the transaction was at arm’s length. It should be observed, in passing, that the attorneys presently appearing for the parties did not participate in any of the transactions before this action was instituted.
But even though the purchase price was arrived at through arm’s length negotiations, the nature of the transaction, and the conglomerate and varied interests of the owners, lessors and lessees .resulting therefrom, are so unusual and novel that the court may not rely upon the purchase price of the half interest in the land as the indicator of the value of all the land.
“ In the various definitions of market value of real property stated by the courts there appear the words ‘ under ordinary conditions ’ or ‘ under ordinary circumstances ’ or words of like import ” (Heiman v. Bishop, 272 N. Y. 83, 86-87, supra). Here, *12 the conditions were not ordinary. For, besides the unique circumstances of the purchase and execution of the option, as adverted to above, the option itself was unusual. It could not be exercised until the lapse of some eight years after the term of the leaseback to Hilton Hotels Corporation had expired — by which time Hilton or its assignees might have had no interest in the premises at all. In other words, it was an option created in a potential vacuum.
Also, the exercise of the option resulted in an unusual relationship between co-owners of the same land, each having conflicting interests. Thus, although Plaza owns a half interest in the land, it is to its advantage to keep the value of that land as low as possible. For, it is not only an owner, but also a tenant; and under article Two of the lease, the lower the valuation of the land, the lower the rent Plaza is required to pay defendant.
Too, the lease required by the option is itself unusual, containing uncertainty as to the amount of rent' to be received by the lessor. Until the question was settled by .the courts (22 N Y 2d 846), it was unclear whether the land should be valued as encumbered by the lease and by the restriction for use for hotel purposes only, or whether it should be valued free of the lease and any restrictions, and available for the best use. Two Judges of the Court of Appeals concluded that sufficient fact issues existed to warrant a trial as to that question (see dissenting opn. of Bbeitel, J., concurred in by Jasest, J., in 22 N Y 2d 846, 847-853). At the time defendant acquired and exercised the option and executed the lease, that uncertainty had not yet been judicially removed.
Similarly uncertain under the lease is the amount of contribution required of defendant for real estate taxes, since such charges were made to depend on subsequent, extremely uncertain valuations not only of the land, but. also of the land, buildings and improvements as a whole. Indeed, the lease provides for 11 separate appraisals during the initial 20-year term and the 30-year renewal term of the lease.
Because of the uncertainties, the purchase and exercise of the option was highly speculative. Defendant’s purchase of the option was not an ordinary transaction, but a gamble. For, if the entire land was in fact ultimately to be valued by appraisers at twice the price paid for half, that is $10,000,000, that valuation would result in a gross rental of $300,000 a year to defendant, from which defendant would have to contribute a share of the real estate tax. Based on the assessment for 1965, and using the value the Referee ascribes to the buildings and improve *13 ments ($14,500,000), which plaintiffs do not contest, the real estate tax contribution by defendant would be about $103,000, leaving a net return of about $197,000 on defendant’s $5,000,000 investment, which is slightly less than a 4% return. The evidence is that the inflationary spiral was already commencing. Since it could then also be anticipated that real estate taxes were in succeeding years to increase progressively, and since the annual $300,000 gross rent would be constant for 20 years, this return of less than 4% would progressively diminish.
Obviously, there would be little, if any, purchaser interest in acquiring the undivided half interest in the land at such a return, unless the prospective purchaser were a speculator, prepared to gamble that the value of the land ultimately would be fixed substantially higher than $10,000,000. It is not surprising, therefore, that, except for defendant, there seems to have been a lack of purchaser interest for the option. In fact, there does not seem to have been an open market for the sale of the option; this alone made the transaction unusual (People ex rel. Parklin Operating Corp. v. Miller, 287 N. Y. 126, supra).
The record establishes many other respects, some of which are detailed in the Referee’s report which demonstrate that the transactions involved herein were not ordinary or usual.
Both as to the land, and as to the land, buildings and improvements as a whole, therefore, the court, while giving consideration to the price paid for the half interest in the land, may not rely upon that price as determinative of the value of all the land.
In determining the fair and reasonable value of the land, and of the land, buildings and improvements as a whole, the court has had the benefit of the testimony of experts, who have given their opinions as to the values on October 1,1965, as follows:
Land
Buildings and IMPBOVEMENTS
TOTAL
Fob plaintiffs :
Thomas J. Hogan...... $ 8,500,000 $20,500,000 $29,000,000
Paul T. O’Keefe....... 10,000,000 14,600,000 24,600,000
Donald S. MacDonald.. 11,500,000 (Buildings not valued)
Fob defendant :
Edward J. Crawford... 33,333,333 15,900,000 49,233,333
John J. McCormick.... 33,700,000 13,000,000 46,700,000
Alfred Schimmel...... 34,500,000 17,300,000 51,800,000
The opinions of plaintiffs’ experts with respect to both land value and the value of land, buildings and improvements, fall *14 within a relatively narrow range. The same is. true with respect to defendant’s experts. Only Mr. O’Keefe, of James Felt & Co., an expert called by plaintiffs, valued the land at twice the price paid by defendant for the half interest. But a memorandum from the files of James Felt & Oo. — prepared soon after this action was instituted, and dealing with the subject of this action — recites that in 1965 it informally appraised the land for the Hotel Corporation of America at about $14,000,000 to $15,000,000.
In considering the opinions of the experts, the court is not unmindful that “ the appraisal of rental property necessarily involves the discretionary application of one or more accepted methods of computation and we must recognize that appraisers retained in litigated matters, within the limits of professional integrity, tend to adopt those formulae which favor their employer’s position ” (Hiesiger v. Hiesiger, 36 A D 2d 133, 137 [1st Dept., 1971]). The Referee’s report treats in detail with the evidence furnished by the experts, and thoroughly analyzes the merits and flaws inherent in the different approaches each of them took in arriving at a value. After studying the report, and the evidence, the court has concluded that none of the seriously conflicting opinions may be adopted in toto, though they are worthy of substantial weight in reaching an ultimate conclusion (see Matter of City of New York [Coogan], 20 N Y 2d 618 [1967]).
Besides the sale price and the expert evidence, the court has also considered the defendant’s tax returns, which appear to contradict the position now urged by it. But the responsibility is the court’s to make the required findings as to value, and the court is not bound by the values stated in these returns. “ ‘ Just ’ compensation does not mean compensation limited to the just. An admission of an opinion is not controlling as to the fact ” (Matter of City of New York [Lincoln Sq. Slum Clearance Project], 15 A D 2d 153, 163, supra).
«[The court has also studied the report of the Referee, and the Referee’s recommendations. The report is sound in every respect, a model of meticulous, clear, concise and accurate analysis of the applicable law, and of all the evidence adduced at the 45 hearings, at which 4,775 pages of testimony were taken, and more than 100 exhibits received in evidence. But, mindful of its responsibilities, the court has also independently reviewed the entire record, together with the very helpful memoranda submitted by counsel. From all the evidence, and after analysis of the problems present in this case, the court has valued the *15 land, and the land, buildings and improvements :as of October 1,1965.
Accordingly, the court finds and decides as follows:
(1) As of October 1,1965, the value of all the land as encumbered by the lease of defendant’s half interest for 20 years, extendable at the lessee’s option for an additional 30 years, under which the property may be used only for hotel purposes, is $18,500,000;
(2) The rental required to be paid by plaintiffs to defendant for each year of the initial 20-year term under the lease is $555,000, to be paid in equal quarterly installments as required by the lease;
(3) As of October 1,1965 the value of all the land, buildings and improvements is $33,000,000.
The provisions of the lease requiring defendant to contribute its portion of the real estate taxes may be translated into a formula. Applying that formula, defendant’s annual real estate tax contribution is approximately 28.03% of the entire real estate tax in each of the first five years of the term. Pursuant to stipulation between the parties, and pending determination of the appeal from the judgment on this court’s prior decision directing a new appraisal (55 Misc 2d 483), plaintiffs have paid defendant interim rent at the rate of $140,000 quarterly, with no credit for defendant’s required contribution towards the real estate taxes. Accordingly, the court further finds:
(4) Defendant’s obligation for payment of all real estate taxes for each of the first five years of the initial term of the lease is approximately 28.03% of the entire real estate tax, the exact percentage to be computed and stated in the judgment to be entered herein. The provisions of the lease do not permit the court to determine defendant’s contribution-for real estate taxes for the period on and after October 1,1970;
(5) Plaintiffs are awarded personal judgment against defendant for amounts to be computed as follows:
(a) The difference between the amounts actually paid by plaintiffs to defendant as rent for the period from October 1, 1965 through the date fixed for settlement of the judgment, less the amounts required by this judgment to be paid as rent for such period, with interest as to each overpayment from the date of such overpayment to the date fixed for settlement of the judgment; with leave to increase the amount so computed if additional overpayment is made between the date fixed for settlement of the judgment and entry of judgment, with appropriate interest;
*16 (b) An ¡amount equal to approximately 28.03%, the percentage to be exactly computed, of the total real estate taxes paid by plaintiffs for the land, buildings and improvements for each year of the period from October 1, 1965 through September 30, 1970, with interest as to each payment made by plaintiffs from the date when such payment was due through the date fixed for settlement of the judgment, without prejudice to plaintiffs ’ right under the lease to recover from defendant the charge for real estate taxes for the period on and after October 1,1970;
(c) All interest required to be paid shall be at these rates: for the period from October 1, 1965 to June 30, 1968 at 6% per annum; from July 1, 1968 to February 15, 1969 at 71/4% per annum; from February 16, 1969 to August 31, 1971 at 7%% per annum; and on and after September 1,1971 at 6% per annum.
The court retains jurisdiction of this matter for the purpose of granting such further relief as may be appropriate, application for which may be made at the foot of the judgment.
The motions before the court are consolidated and denied; the Referee’s report is confirmed.
Settle judgment on 10 days ’ notice, which proposed judgment shall have attached thereto a schedule detailing by date and amount the quarterly rent paid by plaintiffs for the period from October 1, 1965 through the date fixed for settlement of the judgment and each claimed overpayment, with interest on each overpayment to date fixed for settlement of the judgment, computed as to such overpayment; a separate schedule detailing by date and amount the real estate taxes paid by plaintiffs for the period from October 1, 1965 through September 30, 1970, together with each amount to be charged against defendant, with interest as to each such amount through the date fixed for settlement of the judgment.
Interest at the rate of 6% per annum, or such other rate as may be prescribed by law, shall accrue on the amounts determined to be due by the judgment from and after the date fixed for settlement of the judgment.
This constitutes the decision of the court, pursuant to CPLR 4213. Execution on only the portion of the judgment as directs personal judgment against defendant is stayed for 30 days.