YADCO, INC., Appellant v. YANKTON CO., Respondent

(237 N.W.2d 665)

(File No. 11628. Opinion filed December 19, 1975)

M. T. **Woods**, of **Woods, Fuller, Shultz & Smith**, Sioux Falls, for appellant.

**Richard D. Hagerty, Larry F. Hosmer,** Yankton, for respondent.

DOYLE, Justice.

This is an appeal by Yadco, Ind. (Yadco) of Yankton County, South Dakota, from assessments of real property for the years 1971, 1972 and 1973. The principal contention of Yadco is that the "full and true" value of its property should be based, at least in part, on the amount of income which will be received under a long-term, uneconomical lease consummated by it.

The Yankton County Board of Equalization failed to adopt Yadco's argument and denied relief; Yadco thereupon appealed the Board's decision to the circuit court. The circuit court, after a trial de novo, also rejected Yadco's argument and denied its petition for a reduction in its assessed valuation for each of the years involved. Yadco now appeals to this court. We affirm the trial court on all issues.

## I. The Facts.

Yadco, originally known as Community Development Corporation, was organized in Yankton, South Dakota, in 1969. One "objective" of the firm, as stated in its Articles of Incorporation, was to "BENEFIT THE COMMUNITY AS MEASURED BY INCREASED EMPLOYMENT, PAYROLL, BUSINESS VOLUME AND CORRESPONDING FACTORS." Another purpose was to "engage in any commercial, industrial and agricultural enterprise calculated or designed to be profitable to this corporation * * *."

The record shows that Yadco has engaged in one business enterprise during its existence. The enterprise involved it with Wiltco Manufacturing, Inc., a builder of truck trailers. Wiltco agreed with Yadco that Wiltco would become Yadco's tenant under a 20-year lease in consideration of Yadco's construction of a manufacturing plant to be designed by Wiltco. Wiltco agreed to pay rent of $1,166,154 for the first ten years and $1,064,940 for the second ten years. Wiltco also agreed that it would pay property taxes assessed on Yadco for the leased property; Yadco, however, agreed that it would rebate to Wiltco any property taxes in excess of an aggregate amount of $160,000 paid by Wiltco over the 20-year period. The cost of construction, including the land, was approximately $950,000. According to testimony presented at the trial, the lease was a very poor investment for Yadco, which, because of the low revenue from the lease and because of the obligation to rebate taxes to Wiltco, would lose over $600,000 during the term of the lease.

Yadco's property was assessed at $915,000 full and true value in 1971, 1972 and 1973. Its taxable value was computed at 60% of the true and full value or $539,480 for each of the years.

## II. True and Full Value.

The State of South Dakota has by statute determined that "All property shall be assessed at its true and full value in money * * *." SDCL 10-6-33. The phrase "true and full value" has, in turn, been defined by statute to mean "the usual cash selling price at the place" in which the property rests at the time of the assessment. SDCL 10-6-1. It has been said by our decisions to be

"the amount a willing purchaser will pay a willing seller in an open market." *Sheraton-Midcontinent Corp. v. County of Pennington,* 1959, 77 S.D. 554, 95 N.W.2d 892.

 Often, however, there is no market for the property to be assessed. When this is the case, the assessor must still determine the "full and true" market value and, in so doing, he is to consider "every other element which can reasonably affect its value." *Rau v. Fritz,* 1965, 81 S.D. 311, 134 N.W.2d 773. Stated another way, it is the duty of the assessor to use all of those techniques and facts which accurately reflect "full and true" value and to reject those which do not. *Cf., Tidball v. Miller,* 1948, 72 S.D. 243, 32 N.W.2d 683; *Aetna Life Ins. Co. v. City of Newark,* 1952, 10 N.J. 99, 89 A.2d 385. Factors which ordinarily are to be considered include: "replacement cost less proper deductions * * income from the property," *Sheraton-Midcontinent Corp. v. County of Pennington,* supra; " 'evidence of actual sales of other lands,' " when such sales are made by willing buyers to willing sellers, *Tidball v. Miller,* supra; and previous sales of the particular property in question. *Plaza Hotel Assoc. v. Wellington Assoc., Inc.,* 1973, 73 Misc.2d 6, 340 N.Y.S.2d 796.

The assessor relied on the cost approach in determining that the true and full value of the property in question was $915,000. To verify this conclusion, he compared the reproduction cost per square foot to the reproduction cost per square foot of the Cimpl Building. He stated that the portion of the Cimpl Building, which is apparently roughly comparable to the property at issue, was assessed at a higher cost per square foot. The assessor testified inflation had caused the property to appreciate in recent years to such an extent that the appreciation was greater than depreciation and obsolescence. Therefore, he did not adjust the value downward to reflect these factors.

The assessor testified that he refused to use the income approach because "it does not bear out the true market value of the building." He stated further that he had ignored the lease which Yadco had made with Wiltco because it was irrelevant to the cost approach.

To reinforce the assessor's opinion at the trial, the County of Yankton called an outside expert witness who stated that the valuation of the assessor was "substantially correct." Unlike the county assessor, the outside expert witness testified that he did consider the lease in determining "true and full" market value. It is unclear whether the expert witness relied primarily on the cost approach, comparable sales approach or income approach in making his valuation.

■ The taxpayer, who bore the burden of overcoming the presumption that the assessor's valuation was correct, *Sheraton-Midcontinent Corp. v. County of Pennington,* supra, called a single expert witness. This expert witness testified that the value of the property employing the cost approach was $777,535; that the value of the property employing the standard income approach was $738,000 in 1971, $728,000 in 1972 and $717,000 in 1973; and that the value of the property based on the expert witness' version of the income approach was $160,000. Both the standard income approach and the expert witness' version are calculated by determining the net income and capitalizing it, employing a rate which takes account of interest and risk. "Income," according to the description of the standard income method contained in the Assessor's Manual, is not necessarily "actual" future income but rather it is "fair" or "typical" income in the assessment jurisdiction. "Income," in the taxpayer's version, however, is the "actual" income which will be received under the lease. The wide variation ($717,000 and $160,000) between the derived values may result entirely from the difference in the definition of "income," but the record is insufficient to conclude that this was the only difference in the two approaches.

The taxpayer's expert witness combined the three methods which he had used in valuing the property—the cost approach, the standard income approach and his own income approach—and determined that the "true and full" value of the property was $550,000.

■ It is clear that the taxpayer's analysis hinges on the use of his own income approach. The issue thus presented is whether the taxpayer's income approach, which is based on the capitalization of actual income, can be employed in determining "true and

full" market value when the owner of a piece of property has burdened it with a long-term, uneconomical lease.

The trial court found that the capitalization of actual income to determine "true and full" value was inappropriate when a taxpayer has burdened his property with a long-term, uneconomical lease. We agree.

 In coming to this conclusion, we find ourselves in accord with the decisions of the New York courts. These courts have proceeded from statutes which are very similar to ours in that they require the assessor to determine "full value" and that this is to be interpreted as the " 'price at which the property would sell under ordinary circumstances.' " *People v. Tax Commission of City of New York,* 1962, 17 A.D.2d 225, 233 N.Y.S.2d 501. The New York courts have reasoned that the statute, by requiring an assessment on full value, demands that the value of the property be considered as a whole; both the value to the lessor and to the lessee must be accounted for. In South Dakota, as in New York (*People v. Tax Commission of City of New York,* supra,), there is no provision for the taxation of the lessee for the value of the lease to him; only the lessor is assessed and taxed.[1] Thus, when a lease is made for $1.50 per square foot, as in this case, although the economic potential or economic rent is $1.74 per square foot, $.24 per square foot is not accounted for. The taxpayer's income method, by omitting consideration of this $.24 per square foot, thus presents a distorted picture of the true and full value of the property. See generally, *People v. Tax Commission of City of New York,* supra; *Petition of Ernst,* 1968, 58 Misc.2d 504, 295 N.Y.S.2d 712.

Further support for the concept of assessment of the whole property is found in early decisions of the Massachusetts courts. In *Donovan v. City of Haverhill,* 1923, 247 Mass. 69, 141 N.E.

1. Of course, the parties may shift the burden between themselves as occurred here. This does not affect our reasoning, however, because the valuation, to be accurate, must in any event reflect the value of the property to both the lessee and lessor. It might be noted that we do not here decide whether the burden might not legally fall upon the lessee when the lease is silent and when "overbalancing considerations indicate that result." See *Wycoff v. Gavriloff Motors, Inc.,* 1961, 362 Mich. 582, 107 N.W.2d 820; 51C C.J.S. Landlord and Tenant § 359.

564, the court considered the problem from a different perspective, but its reasoning is apposite. The court found that the "assessment whether to the owner or to the person in possession must be an assessment upon the entire estate and not upon any interest therein." 141 N.E. at 565. The court specifically ruled that the value of a leasehold interest could not be deducted from the full value of the property, for if this were done "the entire estate would escape taxation to the extent of the tax upon the value on the leasehold interest * * *." 141 N.E. at 566.

■ Since it is the duty of the assessor to use only those techniques which accurately reflect the "true and full" value of the property, and since the taxpayer's income approach distorted the result by employing actual income from the lease, the assessor did not err in refusing to use that method of valuation.[2] See Rowland v. City of Tyler, 1928, Tex., 5 S.W.2d 756; New Brunswick v. State of N. J. Div. of Tax Appeals, 1963, 39 N.J. 537, 189 A.2d 702.

Furthermore, we note our view that the county and the state should not be forced to bear the burden of increased taxation merely because a taxpayer, intentionally or through poor business judgment, has consummated a long-term, uneconomical lease. See Petition of Ernst, supra. The sentiment contained in People v. Boyland, 1953, 281 A.D. 588, 121 N.Y.S.2d 238, accurately reflects our sentiments:

> "Assessments cannot be made to trail behind every turn in the fortunes of real property. There are times when property must bear a share of taxation proportionate to value even though it may then have no income, or an income inadequately focused to true value."

We have determined that our law requires the property in question to bear its full burden; a long-term, artificial limitation of earning power by the taxpayer is not for this court to repair.

---

2. Use of the standard income approach, i. e., that which employs "fair" or "economic" rent is, of course, not affected by this decision. See In Re Property of Pine Raleigh Corporation, 1968, 258 N.C. 398, 128 S.E.2d 855. Furthermore, we do not decide any question relating to a short-term, uneconomical lease.

■ The final question pertinent to this issue is this court's scope of review in an appeal from a decision of a trial court in a trial de novo of an assessment matter. We have previously stated that this court was to determine whether there was "substantial evidence" to support the verdict. See *In re Robinson*, 1951, 73 S.D. 580, 46 N.W.2d 908; *Rau v. Fritz*, supra.

Subsequent to these cases, however, the court adopted RCP 52(a) (now SDCL 15-6-52(a) ) which states in part:

> "In all actions tried upon the facts without a jury or with an advisory jury, the court shall unless waived * * . * find the facts specially and state separately its conclusions of law thereon * * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

The statute on its face applies to all actions tried to a court; it makes no exception for actions tried .de novo. We therefore hold that this court's proper scope of review of a trial court's decision in a trial de novo of an assessment matter is whether the decision of the trial court was "clearly erroneous." Language in *In re Robinson*, supra, and *Rau v. Fritz*, supra, which conflicts with this holding is hereby overruled.

In applying the "clearly erroneous" standard, we turn for guidance to *In Re Estate of Hobelsberger*, 1970, 85 S.D. 282, 181 N.W.2d 455. That case held that:

> "The question for the appellate court is not whether it would have made the same findings the trial court did, but whether on the entire evidence it is left with a definite and firm conviction that a mistake has been committed. *Zenith Radio Corporation v. Hazeltine Research Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129."

■ Our inspection of the record indicates that there is strong evidence supporting the trial court's determination of "true and full" value in the assessor's testimony, especially with respect to the cost approach as verified by comparison of the subject property to a comparable building. The assessor was also

supported by an expert witness who testified that on the basis of the cost, comparable sales and income approaches, the valuation was substantially correct. The expert, however, did little to explain his testimony and therefore it can be given little weight.

The taxpayer's expert witness likewise did little to explain his use of the standard income approach. His testimony as to the cost approach was well refuted by the assessor's testimony. Finally, we have determined above that his own income approach, which we have called the "taxpayer's income approach," must be disregarded.

An analysis of this evidence does not leave us with the "definite and firm conviction" that the trial court erred in its verdict and that verdict must therefore be sustained.

## III. Sales Ratios.

As noted above, the city assessor, in each of `the tax years in question, valued Yadco's property at 60% of its "true and full value" for the purpose of taxation—60% of $915,000 or $539,480. In so doing, the assessor followed the mandate of SDCL 10-6-33 which states that, "All property shall be assessed at its true and full value in money but only sixty per cent of such assessed value shall be taken and considered as the taxable value of such property * * *."

Yadco notes, however, that other property in the county was not taxed at the 60% level. It indicates that the average sales ratio in Yankton County varied from 54.2% in 1971 to 51.9% in 1973, meaning that property was assessed at 54.2% to 51.9% of the price at which it was subsequently sold. The statistics also indicate that the county weighted average varied from 53.0% in 1971 to 49.7% in 1973.[3]

At this point, Yadco's argument becomes difficult to discern. We cannot, for example, determine whether it argues that the circuit court should correct an assessment in which, for example,

---

3. We note in passing that this court has recognized that Yankton County's sales ratios more closely approximate the 60% statutory ratio than those of any other county. *See State ex rel. Pennington County v. Mernaugh,* 1973, 87 S.D. 495, 210 N.W.2d 409.

the sales ratio varies 5%, 10% or some greater percentage from the 60% statutory ratio. Yadco cites no authority demanding *any* correction in a comparable situation except *Baken Park Inc. v. County of Pennington*, 1961, 79 S.D. 156, 109 N.W.2d 898, in which the variance was 18%. Of course, in this case the variance is but 5.8% to 10.3%. A bare citation, without argument, of Baken Park will not suffice to challenge the variance in this case.[4] Nor are we able to ascertain which sales ratio the appellant wishes us to employ as a standard—the county average sales ratio, the county weighted average sales ratio or the county weighted median sales ratio. As is clear, these figures vary and the appellant should have presented reasoning favoring one of these alternatives.

Our review of the briefs, oral argument and assignments of error does not reveal any question for us to review nor does it disclose argument and authorities supporting a remedy.

We therefore affirm the trial court on all issues.

All the Justices concur.

---

4. We do not, however, imply that the variance in this case could not support a correction but only state that the argument and authorities presented to us and those which we have examined are insufficient to support such a correction. We note further that we do not here set up any parameters within which a correction is, or is not, justified.