**Rod WOODRUFF, d/b/a Buffalo Beer, Appellee,**

v.

**MEADE COUNTY BOARD OF COMMISSIONERS, Appellant.**

Nos. 18490, 18491.

Supreme Court of South Dakota.

Considered on Briefs April 27, 1994.

Reassigned July 29, 1994.

Decided Oct. 12, 1994.

Rehearing Granted Nov. 28, 1994.

772

David M. Dillon, Costello, Porter Hill, Heisterkamp and Bushnell, Rapid City, for appellee.

Bryce A. Flint and Michael J. Jackley, Meade County State's Atty., Sturgis, for appellant.

HENDERSON, Retired Justice (on reassignment).

## PROCEDURAL HISTORY/ISSUE

In 1992, Ron Woodruff, doing business as Buffalo Beer, was denied renewal of his malt beverage license by the Meade County Board of County Commissioners (Board). When he applied for the same license in 1993, he was again denied. He appealed both denials; and, in a *de novo* trial consolidating the two appeals, held July 20–21, 1993, the trial court reversed the Board and ordered it to approve Woodruff's 1993 application. This case was considered on briefs at the April 1994 Term of Court. Board appeals the following issue:

> Did the trial court clearly err when it held that the Board abused its discretion in refusing to renew Buffalo Beer's malt beverage license?

Holding that the trial court clearly erred, we reverse and reinstate the Board's original decision.

## FACTS

Woodruff is the owner and operator of the Buffalo Chip Campground near Sturgis, South Dakota. Within the confines of this 80–acre campground, which is neither platted nor has a dedicated public right-of-way, is a concert facility and beer establishment known as Buffalo Beer, also owned and operated by Woodruff. These facilities typically operate only in conjunction with the annual Sturgis Motorcycle Classic.

When Woodruff's malt beverage license for Buffalo Beer was not renewed in 1992, the Board justified its denial based on the camp-ground's "pornographic behavior" and the inability of law enforcement to work effectively on the premises. In 1993, the application was denied on the "basis of location."

During trial, representatives from several law enforcement agencies testified as to their first-hand knowledge of the Buffalo Chip and other area campgrounds. The trial court also heard the testimony of Woodruff and his employees. Thereafter, Findings of Fact and Conclusions of Law were entered conceding that although there have been "sporadic problems," the same also occurs at other area campgrounds. The trial court also found that safety concerns have lessened with the passage of time. Ruling that the Board's decision was an arbitrary exercise of discretion, the trial court reversed and ordered the Board to issue a malt beverage license to Woodruff for Buffalo Beer.

## DECISION

Under SDCL 7–8–30, the trial court took evidence and decided the Board's decision *de novo*. *Keogan v. Bergh*, 348 N.W.2d 462, 464 (S.D.1984). Pursuant thereto, there were thirty-one Findings of Fact and nine Conclusions of Law entered. To reverse, this Court must be definitely and firmly convinced that a mistake has been committed. SDCL 15–6–52(a); *In re Proceedings for Deposit in Court*, 417 N.W.2d 187, 188 (S.D.1987); *In re Estate of Hobelsberger*, 85 S.D. 282, 289, 181 N.W.2d 455, 459 (1970). We so hold.

Under SDCL 35–2–1.2, the Board had the discretionary power to approve or disapprove the license renewal for the Buffalo Chip. We set it forth in its entirety:

> All applications for retail licenses except those set forth in § 35–2–1.1 shall be submitted to the governing board of the municipality within which the applicant intends to operate, or if outside the corporate limits of a municipality, to the board of county commissioners of the county in which the applicant seeks to operate. The application shall be accompanied by the required fee. The governing board shall have discretion to approve or disapprove the application depending on whether it

deems the applicant a suitable person to hold such license *and whether it considers the proposed location suitable.* (Emphasis supplied.)

This same discretionary power included the right to determine if the opposed location was suitable. Having said statute before them, and considering all of the above evidence, the Board declined to renew the license due to the "basis of location."

On appeal to the Eighth Judicial Circuit Court, two dozen officers from several different law enforcement agencies testified about safety and/or law enforcement hindrances at the Buffalo Chip. All agreed that, for the officer's own safety, no uniformed officer should attempt to enter the grounds without adequate backup. However, on at least two occasions where officers, in pursuit of vehicles fleeing into the Buffalo Chip, did attempt to enter without immediate backup, the police vehicles were stopped by people at the gate, thus permitting the pursued vehicle to disappear into the campground's crowd. In a separate incident, a state trooper testified that he was denied access to make observations. Woodruff testified that his security people (typically lay persons with little background in security or public safety) did not bar the police; rather, rally participants were probably responsible. The trial court agreed. If these latter contentions are true, then Woodruff's security was obviously not securing the entrances and did not prevent patrons from interfering with law enforcement.

It is apparent that the Findings of Fact understate the evidence and testimony presented. Finding XIII states that in one instance, officers were called to the campground; but when they arrived, they were barred by Woodruff's security and were informed they were no longer needed. Same finding states, "[I]n a stabbing incident in 1990, officers readily entered the campground and took care of the situation." This is an erroneous summarization of the incident. Two Division of Criminal Investigation (DCI) agents of the State of South Dakota were escorted by "security" amidst the crowd to an area in front of the stage where they encountered a "great big guy wearing a black jacket" who was standing on the knife used in the stabbing of a 16–year old intoxicated female. As the entertainment on stage continued without interruption, the great big guy told the agents, "Don't make a scene, just bend over and pick up the knife and get out of here." No investigation of the crime scene was able to occur.

Finding XXI reveals, "Appellant [Woodruff] has cooperated with and helped law enforcement and at their request placed himself in life-threatening situations on more than one occasion." Said finding refers to the type of conduct at the campground. Consider the fact that a motorcycle gang took over the stage one year. There is also evidence that a rape occurred at the Buffalo Chip, but no charges were ever brought. Apparently, Woodruff and his security do not have control over the premises.

█ Patrons, numbering as high as 15,000, must wander about in the dark except when near the stage and concession areas. With this environment, law enforcement (including undercover officers) cannot properly investigate any crime scene at the Buffalo Chip, let alone adequately police it. Roping off a crime scene is considered a fruitless task. Further testimony revealed other instances of police access being controlled, including assertions that Woodruff had to be contacted first before police would be allowed through the gate. The trial court's findings concerning police access and safety are against the weight of the evidence. *R & S Const. Co. v. BDL Enterprises,* 500 N.W.2d 628 (S.D. 1993).

Partying and entertainment often last throughout the night at the Buffalo Chip. Nude dancing by young women on the campground's stage has been a mainstay throughout Woodruff's tenure as owner, notwithstanding Meade County officials notifying him that such nudity was intolerable. In 1990, a 16–year–old Sturgis girl was photographed and videotaped as she danced nude on the Buffalo Chip with alcohol in her possession. Nudity has continued on the stage, nevertheless.

It is undisputed that juveniles often have access to the Buffalo Chip. Woodruff's wit-

nesses freely admitted that they frequently catch people sneaking through the barbed wire fence. Although there is no evidence that alcohol is being sold to minors, juveniles have been found drinking intoxicants on the premises. Police have also encountered and arrested numerous underage drinkers who had just exited the Buffalo Chip.

To assert that the Board's decision is merely arbitrary is to ignore the facts. Comparisons have been made to other campgrounds, such as the Bentshoe campground, but cross-examination of witnesses failed to produce evidence that police access had been restricted or that security did not have control at any of the other campgrounds. Regardless, to permit Buffalo Beer to have a malt beverage license under the guise that Bentshoe is supposedly just as unsafe, results in a two wrongs make a right argument. Unlike the Buffalo Chip, Bentshoe does not sell alcoholic beverages. Admittedly, a booth, operated by an independent group *with a one-day special event license,* has sold beer during Bentshoe's concerts. The Board, per *Randall's–Yankton, Inc. v. Ranney,* 81 S.D. 283, 134 N.W.2d 297 (1965), has established a line in the sand that the Buffalo Chip has crossed.

Of the nine Conclusions of Law entered by the trial court, Conclusion III bears particular scrutiny and mention. It expresses that the inability to adequately police, access by minors, lack of access by law enforcement, and the type of business engaged in by Woodruff are "endemic to the Sturgis area during the motorcycle rally." Endemic means that it is restricted or peculiar to a locality or region. Endemic it might be to the Sturgis area, but the city of Sturgis is located in South Dakota, and the laws of this state still apply to the city of Sturgis and surrounding area.

Additionally, Conclusion of Law VI is a mistake of law for it expresses, "Respondent's decisions in 1992 and 1993 to not renew Appellant's malt beverage license [were] not supported by substantial evidence." As reflected above, the evidence was overwhelming that the Buffalo Chip Campground was an unsuitable location for the malt liquor license, as the Board deter-

mined, due to the plethora of law enforcement problems. Suffice it to say, the facts do not support the conclusions. *R & S Const.,* 500 N.W.2d at 630. Also, the trial court concluded that Woodruff was denied the due process protections of SDCL 35–2–10. Said statute concerns revocation or suspension of a license, logically meaning the license must have been current at the time of suspension or revocation. Such was not the case here; thus, SDCL 35–2–10 is inapplicable here. *See Norgeot v. State,* 334 N.W.2d 501, 503 (S.D.1983) (intent of a statute comes from its plain language).

Obscenity, vulgarity and hostility toward law enforcement officers prevail at the Buffalo Chip Campground. Board held the Buffalo Chip was an unsuitable location for possessing malt beverage licenses. In light of this evidence, we are definitely and firmly convinced that the trial court's findings concerning law enforcement lead to an erroneous result. *Chamberlain Livestock Auction v. Penner,* 462 N.W.2d 479 (S.D.1990).

The Findings of Fact are clearly erroneous, as entered by the trial court, and totally fail to consider the various facts set forth above. The Conclusions of Law, unsupported by the clearly erroneous findings, are mistakes of law. *Permann v. Dept. of Labor,* 411 N.W.2d 113 (S.D.1987). Furthermore, the Conclusions rely upon the fact that "the motorcycle rally presents a unique situation." If it is unique, it does not follow, as a matter of law, that the Buffalo Chip Campground may operate unlawfully.

■ In *Randall's–Yankton* and *Luke v. Mellette County,* 508 N.W.2d 6 (S.D.1993), this Court upheld the denial of alcohol beverage licenses by the respective boards based on unsuitable locations.

> It appears to us that among the factors that may properly be considered in the exercise of a legal discretion would be the type of business which applicant proposes to operate; the manner in which the business is operated; the extent to which minors frequent or are employed in such place of business; the adequacy of the police facilities to properly police the proposed location; as well as other factors

which are inherently associated in the sale of alcoholic beverages.

In considering the above factors which may have a bearing upon whether the location is suitable, *the legislature undoubtedly had in mind the fact that local governing boards, being familiar with their own communities, and in many instances having personal knowledge of facts which would not be available to the licensing authority solely on the basis of the application submitted, are in a better position to determine whether the place where the applicant proposes to operate is a proper and suitable location.*

*Randall's–Yankton,* 134 N.W.2d at 300 (emphasis added). This rationale supports the decision of Meade County. Facts in both *Luke* and *Randall's–Yankton* revealed that inadequacy of police protection may deem a location unsuitable. That truth alone is enough to justify denial of the license. *Luke,* 508 N.W.2d at 8; *Randall's–Yankton,* 134 N.W.2d at 299–300. Herein, not only is Woodruff unable to guarantee compliance with the law, but the design of his business sometimes seems to hinder it. Woodruff simply did not establish that the basis of location of his business was suitable. *Luke,* 508 N.W.2d at 8.

Reversed.

AMUNDSON and WUEST, JJ., concur.

MILLER, C.J., and SABERS, J., dissent.

KONENKAMP, J., not having been a member of the Court at the time this case was submitted to the Court, did not participate.

SABERS, Justice (dissenting).

The issue is:

**Whether the trial court erred in determining that the Board abused its discretion in denying Woodruff's applications for malt beverage licenses in 1992 and 1993.**

SDCL 7–8–27 provides that "[f]rom all decisions of the board of county commissioners upon matters properly before it, there may be an appeal to the circuit court by any person aggrieved[.]" The appeal shall be

"heard and determined de novo." SDCL 7–8–30.

Thus, the circuit court should determine anew the question ... independent of the county commissioners' decision. The court exercises independent judgment. This means that the trial court should determine the issues before it on appeal as if they had been brought originally. The court must review the evidence, make findings of fact and conclusions of law, and render judgment independent of the agency proceedings. (Citations omitted.)

*Keogan v. Bergh,* 348 N.W.2d 462, 464 (S.D. 1984). The trial court concluded that under the de novo review standard of SDCL 7–8–30, the refusal to renew Woodruff's malt beverage licenses was an arbitrary exercise of the Board's discretion. According to the trial court, the same concerns such as the ability to police, access of minors, access by law enforcement, and the type of business engaged in by Woodruff, are endemic to the Sturgis area during the motorcycle rally. The trial court further concluded that it was "an abuse of discretion to single out and penalize [Woodruff] for the same circumstances presented by and to other license holders."

While the board of county commissioners of the county in which an applicant for a retail liquor license seeks to operate "shall have discretion to approve or disapprove the application depending on whether it deems the applicant a suitable person to hold such license and whether it considers the proposed location suitable," SDCL 35–2–1.2; *Luke v. Mellette Cnty.,* 508 N.W.2d 6, 7 (S.D.1993), this court's scope of review of a trial court's decision in a trial de novo is whether the decision of the trial court was clearly erroneous. *See Yadco, Inc. v. Yankton Cnty.,* 89 S.D. 651, 237 N.W.2d 665, 669–70 (1975) (holding that the Supreme Court's proper scope of review of a trial court's decision in a trial de novo of an assessment matter is whether the decision of the trial court was clearly erroneous). Therefore, the issue presented on appeal is whether the trial court was clearly erroneous in concluding that the Board abused its discretionary powers in refusing to approve the 1992 applica-

tion because "law enforcement cannot work effectively" and the "campground has catered to pornographic behavior," and the 1993 application based on location.

The Board's refusal to renew Woodruff's applications because law enforcement cannot work effectively at Buffalo Beer, the campground has catered to pornographic behavior, and the location was not suitable, was found by the trial court to be an arbitrary exercise of the Board's discretion. Under the clearly erroneous standard, "[t]he question for the appellate court is not whether it would have made the same findings the trial court did, but whether on the entire evidence it is left with a definite and firm conviction that a mistake has been committed." *Yadco*, 237 N.W.2d at 670 (citing *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970) (citations omitted)). Due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. SDCL 15–6–52(a); *Yadco*, 237 N.W.2d at 669; *Hobelsberger*, 181 N.W.2d at 458 (citation omitted).

The trial court found Woodruff cooperated with and helped law enforcement. According to the trial court, he has complied with all requests made of him by the Board and while there was slight evidence of underage consumption, there was no evidence of any ille-

gal sales of alcohol to any underage buyer, or of any liquor law violation by Woodruff's staff. Responsible people have been hired to run the beer stand and effective methods have been employed to prevent the sale of beer to underage consumers. The trial court also found that although uniformed officers may elect not to enter Buffalo Chip for routine patrol, compliance with beverage sale regulations can be monitored by undercover officers. In fact, testimony was presented that law enforcement has similar concerns and instructions regarding other campgrounds and would not change any of its activities even if Woodruff did not have a beer license at Buffalo Chip. There *is* evidence to support the trial court's Findings of Fact and I cannot say the Findings are clearly erroneous.

In issuing its Findings of Fact and Conclusions of Law, the trial court found that "[t]his Court had an opportunity to view the testimony and demeanor of [Woodruff] and his witnesses and specifically finds that testimony credible and entitled to great weight." An objective reading of the trial transcript indicates that the majority opinion is jumping headfirst into the jury box and usurping the role of the factfinder. A review of the evidence does not leave one with a definite and firm conviction that the trial court erred.*

---

* Although the majority opinion suggests that the trial judge understated the evidence, one can argue that the majority opinion overstates the evidence.

The following is an objective review of the transcript concerning the majority's claims:
1) *The claim that officers in pursuit were denied access.*

There were two incidents described in the record where officers pursued speeders off the highway into the Buffalo Chip turn off and were stopped by individuals at the gate who wanted to know what was happening. However, there was evidence that the individuals may not have been Buffalo Chip employees and that the pursuing officers were some distance from the speeding vehicles. Additionally, all law enforcement have standing orders not to enter the Sturgis area campgrounds without significant back-up, so it was unclear whether the officers should or would have pursued the speeders further into Buffalo Chip.

The other incident involved the commander of the state troopers. He wanted to drive down a road adjacent to the campground to observe the area and the security force told him he could not. The commander told them to immediately allow

him through or they would be charged, and the security people let him through.

The majority opinion discusses an occasion where officers were called to the campground and then were refused entrance. The trooper involved testified that staff called law enforcement to remove someone who would not leave. However, when they arrived security told them they were no longer needed because the problem was under control. The trooper testified that it is not unusual for callers to tell law enforcement when they arrive that help is no longer needed, because the problem is under control.
2) *Stabbing incident where officers picked up knife and were told by large man in a black jacket, "Don't make a scene, just bend over and pick up the knife and get out of here."*

Testimony by the officer investigating the incident indicated that he believed the remarks were meant for the safety of the two officers in the crowd, not as an attempt to direct the investigation. Additionally, testimony by another officer indicated that the perpetrator in the stabbing was arrested and removed from the campground. Testimony by law enforcement indicated that there was another stabbing at another

*Yadco,* 237 N.W.2d at 670. Therefore, the trial court's Order reversing the Board's de-

campground, a shooting at another campground, and a shooting and stabbing on the Main Street of Sturgis.

3) *Evidence that a rape occurred but no charges were ever brought.*

The only reference to a rape in the record was an incident described by the officer as "supposedly a rape took place. We had received information that the perpetrator had been bitten in the groin area. We were given a physical description and then asked to walk around the grounds to see if we could identify an individual walking that matched the description that exhibited pain in the groin area." Police in plain clothes investigated the incident, but the alleged perpetrator was never found. There is no information indicating that the investigation was hindered or inadequate.

4) *Assertions that the owner of Buffalo Chip had to be contacted first before entry into gate would be allowed.*

The sheriff of Meade County stated he orders all his officers, when investigating a problem at any Sturgis campground during the rally, not to go in alone. He tells them to "wait at the gate until you get sufficient backup and preferably you meet the owner there and discuss what the problem is and take care of it and get out." Another campground owner indicated that the standard procedure is for law enforcement to meet the owner at the entrance of the campground and discuss the problem before entering the campground.

5) *Juveniles' access to Buffalo Chip*

There was no evidence that the beer stand at Buffalo Chip sold beer to underage customers. Security officers card individuals entering the premises to insure they are at least eighteen years old. Additionally, employees wander the concert area and ask individuals who appear to be under 18 for identification. Evidence indicated that the owner of Buffalo Chip hired local teachers to work at the beer stand and campground because they would be better able to identify area teenagers. Although there was testimony that some individuals under 21 leave Buffalo Chip intoxicated, the evidence was unclear as to whether the individuals were obtaining beer at Buffalo Chip or elsewhere. Some law enforcement witnesses indicated that juvenile consumption is less of a concern and treated less seriously during the rally, because of other law enforcement issues. Witnesses indicated that the police could place undercover officers in the area if that were a problem with selling beer to juveniles. The sheriff of Meade County stated that because he has had no complaints indicating that Buffalo Chip sells to minors and he has more important concerns during the rally than a few underage drinkers, he did not elect to place undercover agents at Buffalo Chip. Although some officers said that juveniles leaving Buffalo Chip were intoxicated, evidence was unclear as to the severity of the problem. For example, two officers stated that they have contacts with juveniles two or three times during rally week on the road leading to Buffalo Chip. Another stated he had one juvenile contact in 1992 outside of Buffalo Chip. He took the alcohol and wrote two tickets, but could not say where the alcohol had been purchased. Another officer stated that a sixteen year old was discovered intoxicated at Buffalo Chip in 1990, but it was later learned that she had actually become intoxicated in Box Elder.

6) *Juvenile Nudity*

Apparently, during the 50th anniversary rally, a 16–year–old girl danced on the stage in the nude while drinking beer and may have been involved in other pornographic behavior. Also, a 17–year–old girl was photographed one year lifting her shirt up and exposing her chest. Witnesses indicated that there was nudity at other campgrounds and that Buffalo Chip employees card individuals at the gate to prevent juvenile attendance.

7) *Other*

In addition to the above evidence, there was testimony that the problems experienced at Buffalo Chip are identical to problems at other campgrounds and concert areas during the rally. As for police reluctance to enter the campground to enforce the law, law enforcement personnel unanimously acknowledged that they were not to enter many Sturgis area campgrounds without back up. A former sheriff of Meade County testified that Buffalo Chip was cooperative with law enforcement and that he had no objection to Buffalo Chip holding a beer license. He stated that denying the license would probably result in more intoxicated people on the road, because they would leave the campground to get more alcohol. Other law enforcement personnel acknowledged that the owner of Buffalo Chip was cooperative and had met with law enforcement on various occasions to coordinate security before the rally. Although the Hell's Angels insisted on parading across the Buffalo Chip stage one year, a former DCI investigator who now works for the U.S. Treasury/Alcohol, Tobacco and Firearms said he would not have attempted to remove the gang by force if he had been the chief of security at Buffalo Chip and that he could not say security should have acted any differently than they did. He acknowledged that gangs may be a problem for lots of area campgrounds. Law enforcement officers were uncertain whether denying a liquor license would have any effect on controlling drinking, nudity, etc, at Buffalo Chip or elsewhere. The current sheriff stated that he would need two times his law enforcement personnel to adequately police all the area campgrounds, but that increased manpower was unlikely.

This objective review of the claims made by the majority opinion against the transcript confirms there is competent and substantial evidence to support the trial court's decision.

nial of Woodruff's 1992 and 1993 malt beverage license applications should be affirmed.

MILLER, C.J., joins this dissent.