In the Matter of the TAX APPEAL OF
BROOKINGS ASSOCIATES,
Plaintiff and Appellant,

v.

SOUTH DAKOTA STATE BOARD OF
EQUALIZATION, Defendant and
Appellee.

No. 17461.

Supreme Court of South Dakota.

Considered on Briefs Oct. 24, 1991.

Reassigned Jan. 13, 1992.

Decided March 25, 1992.

James E. Carlon, Pierre, for plaintiff and appellant.

Mark Barnett, Atty. Gen., David D. Wiest, Asst. Atty. Gen., Pierre, for defendant and appellee.

HENDERSON, Justice (on reassignment).

## PROCEDURAL HISTORY/ISSUE

Brookings Associates (Associates), a partnership, contests the assessed valuation imposed upon its property by Brookings County Director of Equalization, Beryle Sessions (assessor). Associates initially appealed to the Brookings County Board of Equalization, which did not change assessor's revised assessed valuation of $1,477,465.00. Associates next appealed to the State Board of Equalization, which affirmed the County Board. Associates then appealed to the circuit court for Brookings County, pursuant to SDCL 10–11–43 (1989). The court affirmed the decision of the State Board.

On appeal, Associates raises the following issue:

Is the subject property assessed at more than its full and true fair market value?

## FACTS

The property at issue in this appeal is an apartment complex known as Country Garden Apartments located within the city of Brookings, South Dakota. The apartment complex consists of four separate buildings which contain a total of eighty-eight apartment units. The property also contains forty detached garages and sits upon 5.5 acres of real property. These apartment buildings are the sole assets and business interests of Associates. Daniel Boeckermann, one of the partners in Associates, purchased a controlling interest in the partnership. He presently owns a seventy percent interest which he obtained by assuming the debt outstanding against Country Garden Apartments.

The assessor initially indicated to Boeckermann that based on her calculations, the property had a value of $1,043,379. The assessor then revised her valuation of the property after changes and recalculation, to reflect a value of $1,227,797.00 to the property. Later, however, the assessor assessed the property to indicate a value for *tax purposes*, at $1,477,465.00.

During the trial to the court, testimony was heard from three individuals: Boeckermann; Verne Hansen, a real estate appraiser employed by Associates; and assessor. Each individual gave an opinion as to the true and full value of the subject property. Boeckermann testified the property should be valued at $1,090,000. Hansen opined the value of the property was $1,095,000 and the assessor testified that the value of the property was $1,477,465. It appears the difference in valuation resulted from different techniques utilized by those individuals. Both appraiser Hansen and the county assessor utilized the income approach, comparable sales approach, and cost approach in making their respective assessments of the property.

### Income Approach

The income approach is "the method of valuing income producing property by capitalizing net income by a rate which takes into consideration the risks involved in the investment." ARSD 64:03:01:01(3). Hansen prepared the income approach analysis utilizing the actual income history of the apartments. He reduced the actual income history of the apartments by the actual reasonable expenses which he determined through his investigation. He included, in his list of expenses, the real estate taxes paid by Associates for the apartments. Hansen concluded that with using the income approach, the property had a fair market value of $1,096,500.00.

The county assessor did not consider the actual income history but instead utilized what could be the income potential in Brookings for the apartments. County assessor did not consider the actual operating income and expense. Assessor relied upon what she believed would be a typical rate of expense in the community and average income potential.

The assessor calculated a valuation, based on the income approach, of $1,043,-379.00. She subsequently altered her methodology and established a value of

$1,227,797.00. She subsequently altered her valuation, for *tax purposes*, a third time and established a property value of $1,439,020.00.

### Comparable Sales Approach

Another method of valuing property is the comparable sales approach. In this analysis, one compares the subject property with comparable properties that have recently sold within the area. *See,* ARSD 64:03:01:02.02. Following an investigation, Hansen determined that there were sufficient sales of apartment buildings in Brookings to make an assessment based on comparable sales. He utilized four comparable sales of apartment buildings and analyzed each according to the Real Estate Commission's administrative rules. He determined that comparable sales indicated a value for the Country Garden Apartments of $1,084,-745.00.

The county assessor used only two sales for her appraisal report and did not analyze those comparable sales in accordance with the Real Estate Commission's rules for real estate appraisals. Based on the two sales, the assessor opined that based on sales, the value of the Country Garden Apartments of $1,477,465.00 would be reasonable.

### Cost Approach

The final approach to placing value on property is the cost approach. Both parties utilized the Marshall & Swift Valuation Service cost estimates manual in computing costs to assessed value.

Hansen used this manual to determine the cost of the apartments if built new. He subtracted from that amount estimates of the amounts for physical depreciation, functional obsolescence and economic obsolescence. He followed the guidelines of the Real Estate Commission for the preparation of appraisal reports. In addition, Hansen considered the three types of depreciation, mentioned above, as acknowledged by this Court in *Rau v. Fritz,* 81 S.D. 311, 134 N.W.2d 773 (1965). Based on this implementation of the cost approach, Hansen estimated the value of the apartments to be $1,187,000.00.

In utilizing the Marshall & Swift cost estimates manual, assessor reduced the amount based on those estimates by including physical depreciation and locational depreciation. Assessor, in cursory manner, occasionally included an element of functional depreciation. Assessor did not include economic obsolescence into her calculations. Assessor reiterated her opinion, based on this analysis, that the value of the property was $1,477,465.00.

### DECISION

We are confronted with one issue and one issue only: Is the subject property, apartment buildings known as the Country Garden Apartments, assessed at more than its fair market value? The record so reflects and, thus, the assessment of the Brookings County Director of Equalization and the decisions of the State Board of Equalization and the trial court are reversed.

Essentially, Article XI, section 2 of the South Dakota Constitution, proscribes: "... *the valuation of property for taxation purposes shall never exceed the actual value thereof.*" Accord, *Roseland v. Faulk Cty. Bd. of Equal.,* 474 N.W.2d 273, 275 (S.D.1991); *Kindsfater v. Butte County,* 458 N.W.2d 347, 350 (S.D.1990); *Codington County Bd. of Com'rs. v. Bd. of Equalization,* 433 N.W.2d 555, 557 (S.D. 1988).

County assessor was very inconsistent in her thinking and assessment methodology. Initially, when discussing the value of the property with Boeckermann, she indicated that based on her calculations the property had a value of $1,043,379.00. After rethinking the calculations and making some changes, she then indicated that in her opinion, the property had a value of $1,227,797.00. Later, she assessed the property for *tax purposes* at $1,477,465.00. This figure was adopted, to the penny, by the trial court. State Board of Equalization is appellee. Appellee submitted 8 pages of "Appellee's Proposed Findings of Fact and Conclusions of Law;" in toto, trial court adopted these and crossed out "Appellee's Proposed" and affixed initials

of the trial court thereon. This same procedure was followed on a two page Judgment. This is not a good practice for it detracts from the objectivity of the decisional process; therefore, the vitality of a judge-made decision is greatly diminished. Such a practice is frowned upon. *See, Roberts v. Ross*, 344 F.2d 747, 751–752 (3rd Cir.1965) (this practice viewed with disfavor in majority of Federal District Courts); *Vetter v. Vetter*, 267 N.W.2d 790, 797 (N.D. 1978).

In challenging a tax assessment ruling, Associates has two presumptions to overcome:

First, there is a presumption that tax officials will do their duty in accordance with the law and not act unfairly and arbitrarily regarding the assessment of property. *Skinner v. New Mexico State Tax Comm'n*, 66 N.M. 221, 345 P.2d 750 (1959). Second, there is a presumption that the county director of equalization's valuations are correct. *Mortenson v. Stanley County*, 303 N.W.2d 107, 110 (S.D.1981).

*Hutchinson County v. Fischer*, 393 N.W.2d 778, 782 (S.D.1986). *Accord, Roseland*, 474 N.W.2d at 275. To overcome the presumption the Director of Equalization's valuation is correct, an appellant "must produce sufficient evidence to show the assessed valuation was in excess of true and full value, lacked uniformity in the same class or was discriminatory." *Knodel v. Board of County Commissioners*, 269 N.W.2d 386, 389 (S.D.1978). *Accord, Roseland*, 474 N.W.2d at 275.

■ However, when there is evidence that contradicts a presumption, the presumption then evaporates. *Headlee v. N.Y. Life Ins. Co.*, 69 S.D. 499, 12 N.W.2d 313 (1943). Under South Dakota law, a presumption does not shift the burden of persuasion, but relates only to the burden of initially producing evidence on a particular issue. A presumption is *not* evidence in and of itself, and may not be relied on by a party in whose favor it operates when the other party has produced evidence. *McKiver v. Hamm Brewing Co.*, 67 S.D. 613, 297 N.W. 445 (1941).

■ In this case, the presumption entirely evaporates. County assessor and State Board of Equalization cannot, in law, rely upon the presumption set forth in *Skinner v. New Mexico, Mortenson, Hutchinson County*, and *Roseland*. Having made this induction, we must advance to other observations.

■ A damning admission was made by the county assessor in the proceedings below. She admitted her appraisal and her valuation methodology was performed *for the purposes of a tax valuation* as compared to an appraisal executed to determine that price which a willing buyer and willing seller would agree upon. Put another way, it was not a valuation with the constitution of our state in mind; it was an evaluation for a tax purpose, in itself. This cannot be. Constitutional and statutory assessment requirements must be observed by an assessor. In reviewing the three approaches, i.e., *Income Approach, Comparable Sales Approach*, and the *Cost Approach*, the assessor prepared an appraisal to reflect a *TAX APPROACH*. This is wrongly skewed against constitutional dictates for it abdicates something entirely different than the words of the state constitution "... never exceed the actual value thereof." S.D. Const. art. XI, § 2. The full and true value of the property in question is the price which a willing purchaser will pay a willing seller in the open market. *Yadco, Inc. v. Yankton County*, 89 S.D. 651, 237 N.W.2d 665 (1975). Examples of a fallacious technique, employed by the assessor, were rejections of a sales approach *and* looking at economic revenue *potential*, rather than, in the latter instance, *actuality* of actual income and expenses. Said another way, assessor's viewpoint and platform of thought was *artificial*. Obviously, a willing buyer would consider what these units were earning, not what they might earn. There was a plethora of evidence to substantiate that the units were well managed. The history of the economic production of the units was salient; not its projected or supposed economic production. Here, the Director of Equalization admitted on cross-examination that any reasonable buyer would be concerned with

the actual income and expenses of the Country Garden Apartments. Further, on cross-examination, she admitted that a proper appraisal must take into consideration the revenue history of the property unless the property would be a newly constructed property where there is no income history.

■ Having expressed that the wrong methodology was employed in arriving at the market value of the property, it is now posited that the assessed valuation of $1,477,465.00 is clearly erroneous. Another gross error was committed by the assessor in theory: She apparently took the position *that the over-evaluation of older buildings combined with the under-evaluation of newer buildings results in (a) equalization and (b) uniformity.* This methodology is another example of a *tax approach* rather than utilizing a constitutional or statutory approach. It is, in effect, an appraisal for tax purposes. Such methodology is also contrary to the decisional law of this state.

■ Other deficiencies noted in the assessor's assessment:

1. Functional depreciation not considered in her appraisal report. This violates our holding in *Rau v. Fritz,* 81 S.D. 311, 134 N.W.2d 773 (1965). Assessor failed to consider economic obsolescence.

2. She relied on a computer program, apparently skewed to a 1988 *regional* study, which *estimates* costs of construction, rather than to look at the actual costs of construction. It was an improper year and a false area.

3. Assessor also refused to consider the acquisition price (selling price) of this property. It was $1,093,243.00. Her original assessment of $1,043,379.00 was $50,000.00 less than the selling price of the property. In the end, her assessment was for over ⅓ of a million dollars more than the property sold for.

Trial court simply relied upon the county assessor's analysis and her methodology; her methodology being erroneous in several facets, trial court's findings were clearly erroneous. An assessment simply cannot exceed the value of the property; manuals, computers, and a goal to establish a tax valuation cannot be vaulted over constitutional, statutory and decisional law. As we expressed earlier, Article XI, section 2 of the South Dakota State Constitution, mandates: "... the valuation of property for taxation purposes shall never exceed the actual value thereof."

The assessment of the Brookings County Director of Equalization and the decisions of the State Board of Equalization and the trial court are reversed.

AMUNDSON, J., concurs.

MILLER, C.J., concurs in result.

WUEST and SABERS, JJ., dissent.

MILLER, Chief Justice (concurring in result).

Although I generally agree with the majority writing, I specifically disassociate myself from the criticism of the trial court's procedural practice (page 875). I strenuously disagree with the assertion in this case that it affected "the objectivity of the decisional process."

I agree that "finding the facts is an important judicial function and that the judge cannot surrender this function to counsel." *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 435 (Iowa 1984). However, the United States Supreme Court has held that even though the findings may not be the "product of the workings of the district judge's mind," they are formally his and will not be rejected out-of-hand and will stand if they are supported by the evidence. *United States v. El Paso Natural Gas Company,* 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964). *See also Hassine v. Jeffes,* 846 F.2d 169 (3rd Cir.1988); *Askew v. United States,* 680 F.2d 1206 (8th Cir.1982); *Bradley v. Maryland Casualty Company,* 382 F.2d 415 (8th Cir.1967); *Kroblin, supra; Bersie v. Zycad Corp.,* 417 N.W.2d 288 (Minn.App. 1987).

The majority cites to the dissenting opinion in *Vetter v. Vetter,* 267 N.W.2d 790, 793–97 (N.D.1978). The dissenting justice was concerned with the lack of a basis for

the trial court's determination. He stated: "Because, in the instant case, the oral opinion is of no aid in understanding, the majority has chosen to make a trial de novo review in order to affirm the judgment."

In this case, Judge Steele made oral findings which he later supplemented with a seven-page memorandum decision. At the end of the memorandum decision he informed counsel to submit their findings pursuant to SDCL 15–6–52(a).

Assuming that a litigant's proposed findings, conclusions, and judgment *completely coincide with the trial court's opinion and holding,* what is wrong with striking the words indicating they are proposals? Would the majority require the judge or his staff to retype the lengthy documents, using the identical words? Or, would the majority have the trial judge insist that the prevailing party retype the exact language merely omitting the word "proposed" thereby putting the party to additional legal costs? Neatness is one thing; necessity is another. The requirements suggested by the majority merely put form over substance.

WUEST, Justice (dissenting).

I respectfully dissent.

In my opinion, the majority has disregarded two basic provisions of settled law in overruling the circuit court, State Board of Equalization, County Board of Equalization, and the County Assessor (Sessions), i.e., (1) giving deference to the circuit court on findings of fact unless clearly erroneous and (2) considering income under a reasonably economic and prudent management rather than actual income.

Before addressing the errors of the majority, I emphasize that Associates has two presumptions to overcome:

First, there is a presumption that tax officials will do their duty in accordance with the law and not act unfairly and arbitrarily regarding the assessment of property. *Skinner v. New Mexico State Tax Comm'n,* 66 N.M. 221, 345 P.2d 750 (1959). Second, there is a presumption

that the county director of equalization's valuations are correct. *Mortenson v. Stanley County,* 303 N.W.2d 107[, 110] (S.D.1981).

*Hutchinson County v. Fischer,* 393 N.W.2d 778, 782 (S.D.1986). Accord, *Roseland v. Faulk County Bd. of Equal.,* 474 N.W.2d 273, 275 (S.D.1991). To overcome the presumption the Director of Equalization's valuation is correct, an appellant "must produce sufficient evidence to show the assessed valuation was in excess of true and full value, lacked uniformity in the same class or was discriminatory." *Knodel v. Board of County Commissioners,* 269 N.W.2d 386, 389 (S.D.1978). *Accord Roseland,* 474 N.W.2d at 275. "[O]ur scope of review of a trial court's decision in a trial de novo of a tax assessment is to determine whether the findings are clearly erroneous." *Kindsfater v. Butte County,* 458 N.W.2d 347, 348 (S.D.1990). Examining the facts developed below, I do not believe the trial court was clearly erroneous.

Article XI, section 2 of the South Dakota Constitution states "the valuation of property for taxation purposes shall never exceed the actual value thereof." *Accord Roseland,* 474 N.W.2d at 275; *Kindsfater,* 458 N.W.2d at 350; *Codington County Bd. of Com'rs. v. Bd. of Equalization,* 433 N.W.2d 555, 557 (S.D.1988). Further SDCL 10–6–33 (1989) provides: "All property shall be assessed at its true and full value in money...."[1] Thus, our constitution speaks of "the actual value thereof," and SDCL ch. 10–6 speaks of "full and true value." The two phrases were discussed by this court as follows:

The terms "actual value" and "true and full value" mean the "market value" of property to be assessed and market value has been defined as the price which a purchaser willing but not obligated to buy would pay an owner willing but not obligated to sell, taking into consideration all uses to which the property is adapted and might in reason be applied.

*Roseland,* 474 N.W.2d at 275 (quoting *Rau v. Fritz,* 81 S.D. 311, 314, 134 N.W.2d 773,

---

1. "True and full value" for real property is the usual cash selling price at the place where the property is located at the time of assessment. SDCL 10–6–1(6) (1989).

775 (1965)). In addition to the statutes involved, a director of equalization must follow the rules found in article 64:03 of the Administrative Rules of South Dakota. SDCL 10–1–16.1 (1989). The three approaches to valuing property which a director of equalization is required to consider and document are: the income approach, the market approach, and the cost approach. SDCL 10–6–33. Turning to the appraisals, we will address each individually.

*Income Approach:*

Using the income approach, Associate's appraiser (Hansen) used Associates' actual rental rates in arriving at estimated annual income. Likewise, he used the actual average vacancy rate of fifteen percent. He included land taxes as an operating expense and treated it as a deduction from gross annual income. He also used Associates' actual maintenance and repairs expense. He used a capitalization rate of 10.3% based upon the "band of investment" technique and research of two comparable apartment complexes in the Brookings community. Based upon the above, Hansen estimated the net operating income to be $112,925. His gross income estimate, based upon actual rental rates, was $309,-000, less $46,345 for vacancies (fifteen percent), for a net operating income before expenses of $262,655. Based on the income approach, Hansen's opinion as to fair market value was $1,096,500.

Sessions used market rent compiled from questionnaires that she sent to, and received from, other apartment owners in Brookings. Likewise, she used average operating expenses of an amount equal to thirty-five percent of the estimated annual income. This percentage was obtained by averaging the operating expenses of other apartment owners and using the average ratio of expenses to gross income. Sessions did not include taxes in operating expenses, but instead added an effective tax rate to the capitalization rate.[2] She used an average vacancy rate of seven percent, again a figure arrived at by averaging the vacancy rates of like properties. Sessions used a capitalization rate of 13.-55% which was arrived at by obtaining equity and mortgage interest rates from lending institutions (resulting in an overall discount rate of .0825%), adding an effective tax rate (.0277%), and a recapture rate based upon forty years average life of the property (.0253%).[3] Using the market rental rate, Sessions found gross income of $322,560, less $22,500 for vacancies (seven percent) for a net operating income before expenses of $299,980 per annum. Based on the income approach, Sessions' opinion as to fair market value was $1,439,020.

Associates contends the proper method of appraisal using the income approach must use the *actual* income, vacancy rate, and expenses for the property rather than market rentals and average expenses for like property. Associates asserts a reasonable buyer and seller would rely on actual income and expenses. The trial court disagreed, reasoning that unless averages are used, "the effectiveness of management of the property [is assessed,] which is not an element properly subject to appraisal."

2. There was a difference of opinion between Hansen and Sessions as to whether real estate taxes are a proper deduction from gross annual income. The Director of Equalization must consider taxes by adding an effective tax rate to the capitalization rate instead of deducting real estate taxes as a deduction from annual income. ARSD 64:03:01:02.03 (1989).

3. ARSD 64:03:01:02.03 (1989) addresses the income approach to valuation of property:

An assessor using the income approach to valuation of property shall estimate the value of a property by determining the present value of the projected income stream. Income and expense analysis builds upon the following components:

(1) Normal unit rent;
(2) Potential gross rent;
(3) Vacancy and collection loss;
(4) Normal gross rent;
(5) Miscellaneous income;
(6) Normal gross income;
(7) Normal expenses; and
(8) Normal net income.

The capitalization rate selected must reflect the proper relationship between the value of the property and the net income it produces. The capitalization rate is composed of an interest rate, a recapture rate, and an effective tax rate.

The trial court noted if actual figures were used, a poor manager would be rewarded by a lower assessed evaluation.[4]

In *Yadco, Inc. v. Yankton County,* 89 S.D. 651, 656, 237 N.W.2d 665, 668 (1975), we held where a taxpayer had burdened his property with a long term uneconomical lease, the capitalization of actual income to determine "true and full" value was inappropriate. Associates argues *Yadco* does not apply because there is no evidence of poor management practices in this case. In *Mortenson v. Stanley County,* 303 N.W.2d 107 (S.D.1981), the taxpayer contended the valuation of the property should be reduced where part of it had been rated as cropland but was instead used as rangeland. We rejected that assertion noting that a decision whether or not to farm such property is a management decision. "[A] landowner should not be able to determine the valuation of property by using it as rangeland when it could be used as cropland." *Id.* at 111. Whether the decision of the landowner was a poor decision or not did not enter into the *Mortenson* holding.

Further, Associates' position is incongruous with our statements in *Rau:* "A prospective purchaser in forming an opinion of the value of property looks to its income potential as distinguished from its actual earnings." *Rau,* 81 S.D. at 317, 134 N.W.2d at 777. "The income producing capacity is ordinarily a factor in fixing valuation for taxation purposes." *Id.;* 72 Am. Jur.2d *State and Local Taxation* § 755 (1974). A prospective purchaser does not, in forming an opinion as to value of property, look at actual earnings of the former management. Instead, the buyer looks to the property's income *potential,* based in part on what has occurred in the past, what other similar properties have done, and based on management changes the buyer himself plans to implement.

In ascertaining the value of property via the income approach, the value of the property is arrived at by capitalizing the net income at the rate of return prevailing in the same section of the country upon investments of a similar nature. 72 Am.Jur. 2d, *supra,* § 755. In such cases, the average net income for a number of years should be considered, rather than the earnings of a single year. *Yadco,* 89 S.D. at 657–58, 237 N.W.2d at 669; 72 Am.Jur.2d, *supra,* § 755. However, it must be emphasized once again it is the earning *capacity* of the property that is the proper element for consideration in valuing property. *Rau,* 81 S.D. at 317, 134 N.W.2d at 777. Thus, the gross receipts considered are such as would be received under a reasonably economic and prudent management, and the expenses to be deducted likewise are not the expenses actually incurred, but such expenses as would be incurred under a reasonably economical and prudent management. 72 Am.Jur.2d, *supra,* § 755. Management effectiveness is simply not an element properly subject to appraisal.

By taking a survey of what other similarly situated businesses were doing, Sessions was essentially establishing the income and expenses based on reasonably prudent management practices. Sessions' valuation based on income was supported by valuations using the cost approach and the market or comparable sales approach which I address next. Sessions based her final assessment on the cost approach, because she felt she did not have sufficient information to make a completely accurate valuation based on income or comparable sales.

*Market or Sales Approach:*

Under the market or sales approach, fair market value of the subject property is estimated by comparing it to similar property which has recently been sold in the area in arm's length transactions. ARSD 64:03:01:02.02 (1989). Hansen listed four comparable sales which occurred between 1986 and 1988. Hansen concluded one provided the best comparison.[5] That property

---

**4.** ARSD 64:03:01:05 (1989) implies estimation of value may properly consider actual gross income and operating expenses, but any such estimation must be based on reliable information. The regulation also states comparison with similar properties is acceptable if reliable information cannot be ascertained. That regulation does not *require* an appraiser to use actual income and expenses, nor would I.

**5.** Hansen stated the other three properties appraised at $31.40, $32.02, and $20.30 per square foot were not the best comparables because they

was the Costello property which Hansen appraised at $13.35 per square foot. Sessions testified the Costello property was not an appropriate comparison because the consideration given in exchange for the property consisted partly of a trade for land in Minnehaha County. In order to use the Costello property for comparison, Sessions testified it would be necessary to appraise the property in Minnehaha County. *See* 29 Am.Jur.2d *Evidence* § 400 (1967) (allowing evidence of value of property traded for subject property amounts to "pyramiding of approximations"). Sessions also noted the Costello property was in worse condition. Hansen's opinion as to the fair market value of the subject property was $1,086,000.

Sessions used two comparable sales, both of which occurred in December 1986. Sessions valued the first comparable at $21.26 per square foot and the second comparable at $25.81 per square foot. Sessions concluded $20.00 per square foot would accurately reflect the valuation of the subject property. Based on comparable sales, Sessions concluded the subject property had a value of $1,508,660.

Associates specifically asserts Sessions should have utilized the acquisition price of the property indicated by Boeckermann's dealings with the former owners wherein Boeckermann agreed to assume their debt, indicating a valuation amount of $1,093,243. The trial court found the sale to Boeckermann was not a valid comparable sale. I agree. In such sales, owners sell to get out of debt. Thus, they may be hard pressed for funds. 29 Am.Jur.2d, *supra,* § 398. Even Boeckermann agreed it is unusual to have a contract for deed written for 100% of the price of the property. I cannot say the trial court was clearly erroneous in agreeing with Sessions on that point.

Sessions testified that, in determining whether a sale was a valid comparable, she went by date of sale, similarity of construction, and similarity of location. Sessions' valuation comports with accepted methods of property valuation for tax purposes. 72 Am.Jur.2d, *supra,* § 781.[6] Moreover, she did not rely on this assessment, but instead relied on the costs approach which in turn was supported by her comparable sales valuation.

*Cost Approach:*

The third method of determining market value is the cost approach where the replacement costs of a new building and land improvements are estimated. A deduction is then made for physical depreciation, functional obsolescence, and economic obsolescence. *Rau,* 81 S.D. at 313, 134 N.W.2d at 775. Finally, the value of the land is added. "Physical depreciation" is "wear and tear occasioned by use and by the elements." "Functional obsolescence" is loss of utility and failure to function because of inadequacies and deficiencies of the property. "Economic obsolescence" is loss of value brought about by changing conditions in the neighborhood causing loss of business. *Id.* In this case, both appraisers used the Marshall and Swift cost estimating service. Hansen consulted the service book, and Sessions used a computer software service supplied by Marshall & Swift. Using the same service, Hansen's opinion of fair market value was $1,187,000 and Sessions' was $1,477,465. From a replacement cost of $2,540,040, Hansen subtracted $1,397,040 in physical, functional, and economic depreciation (35%, 10% and 10% respectively). Sessions subtracted $761,324 in physical, functional and "locational depreciation" (25%, 3.3%, and 8% respectively).

Associates takes issue with the depreciation charged off by Sessions labelled "loca-

---

were "smaller and required larger amounts of adjustment."

6. ARSD 64:03:01:02.02 (1989) provides:
    An assessor using the market approach to valuation of property shall compare property to similar properties that have recently been sold. Adjustments shall be made for the following:

(1) Trades, partial interests, personal property, and incomplete or unbuilt community property;
(2) Physical differences and condition;
(3) Financing and assumed leases; and
(4) Date of sale.

tional depreciation," arguing this is not in compliance with *Rau's* mandate that "economic obsolescence" be used. Associates argues locational depreciation is more narrowly defined. Sessions testified her locational depreciation took into consideration where the property was located. Associate's economic depreciation also considered the property's location. Locational depreciation would seem to include any changes having occurred in a neighborhood, and therefore, the difference is merely one of semantics.

*Conclusion:*

Associates maintains throughout its brief that Sessions improperly assessed the property because she was not assessing the property for a buy/sell transaction but for tax purposes. Sessions substantially complied with legislative directives in assessing the subject property.[7] "Substantial compliance with legislative directives is sufficient in determining assessed valuation." *Knodel*, 269 N.W.2d at 389. It does not appear the property was assessed in excess of its fair market value. Associates has not overcome the assessment's presumed correctness. Therefore, the trial court was not clearly erroneous in sustaining the assessment. I respectfully dissent.

SABERS, Justice (dissenting).

I dissent also.

I would affirm the trial court on the basis that Associates failed in its burden to "produce sufficient evidence to show the assessed valuation was in excess of true and full value, lacked uniformity in the same class or was discriminatory." *Knodel*, 269 N.W.2d at 389; *see also, Roseland*, 474 N.W.2d at 275; and *Mortenson*, 303 N.W.2d at 110.

This case falls far short of *Roseland* where the evidence clearly showed assessed valuation exceeded the actual value of the property. *Roseland*, 474 N.W.2d at 275. Although there are faults and inconsistencies in some of the testimony of Assessor Sessions, they do not destroy her evaluation and the trial court so found. In my view, the majority opinion fails to convince that the findings of fact of the trial court were clearly erroneous.

---

7. South Dakota Real Estate Commission rules govern Hansen. SDCL 36–21–1.1, 14 (1986). Those rules differ in methodology for determining valuation. They do not apply to county assessors who are assessing for tax purposes and must follow the rules found in A.R.S.D. article 64:03. SDCL 10–1–16.1. Thus, the Real Estate Commission Rules are irrelevant.