1998 SD 66

**Henry H. AMERT, Arleen R. Amert, Richard Amert, Donald Amert, Kay Amert, and Susan Amert, Appellants,**

**v.**

**LAKE COUNTY BOARD OF EQUALIZATION,**
**Appellee.**

**No. 20264.**

Supreme Court of South Dakota.

Considered on Briefs April 29, 1998.

Decided June 24, 1998.

Jerome B. Lammers of Lammers, Lammers & Kleibacker, Madison, for appellants.

Chris S. Giles, Lake County State's Attorney, Madison, for appellee.

GILBERTSON, Justice.

[¶ 1.] Property owners Henry, Arleen, Richard, Donald, Kay, and Susan Amert (family collectively referred to as Amert) contest the assessed valuation imposed upon four parcels of property by the Lake County Director of Equalization, Brian Seitz (assessor). Amert initially appealed to the Lake County Board of Equalization (Lake County), which concluded each of Amert's seventeen properties were properly assessed. Amert then appealed to the circuit court for Lake County which affirmed sixteen of seventeen assessments. Amert appeals the circuit court's order only as it relates to four of the sixteen parcels the circuit court concluded were properly assessed. We reverse and remand for further proceedings consistent with this opinion.

### FACTS AND PROCEDURE

[¶ 2.] Amert alleges Lake County improperly assessed the following four properties located in Madison, South Dakota for 1995 tax-year purposes:

1. The 207 West Avenue North property was assessed at $43,800 (an increase of 43% over 1994).

    Amert claims $30,525 to be the correct assessment value;

2. The 202 N.E. First Street property was assessed at $40,200

    (an increase of 74% over 1994).

    Amert claims $23,157 to be the correct assessment value;

3. The 113 North Union Avenue property was assessed at $40,800

    (an increase of 38% over 1994).

    Amert claims $22,870 to be the correct assessment value; and

4. The 210 North Harth Avenue property was assessed at $51,800

    (an increase of 69% over 1994).

    Amert claims $30,713 to be the correct assessment value.

[¶ 3.] Each of the subject properties is an older home built in the early 1900's and at the time of the contested assessment in November, 1994, had been converted into multi-unit rentals. A two-day trial was held in May, 1997, wherein Amert provided testimony which contradicted assessor's valuation. Amert's witnesses criticized assessor's methodology and results. A brief summary of the methods used and results obtained by Amert and assessor for each property follows:

[¶ 4.]     *207 West Avenue North*

[¶ 5.] The West Avenue property was valued by assessor at $43,800 utilizing the cost and market approaches. Amert's appraiser, Norma Goth[1] (Goth), believed the cost approach was not very accurate "because of the age of the property there's so much depreciation, and normally that would be at the very high end of any values that you would come up with." Instead, Goth utilized the market approach to arrive at a $28,000 valuation. She compared the property to three similar properties and then took into account the repairs that would have to be made and that the basement apartments were not suitable for rental after a 1994 flood. Under the income approach, Goth valued this property at $37,000.

[¶ 6.]     *202 N.E. First Street*

[¶ 7.] Assessor valued this property at $40,-200 using the cost and market approaches. Goth discounted the cost approach used by assessor based upon the age and depreciation of the property. Goth gave the most weight to the market approach in making a valuation on this property. She concluded that the larger size of Amert's property compared with the other properties used under this approach did not necessarily translate into greater rental value because of the increased utility and maintenance costs. Under the income approach, Goth valued this property at $18,630.

[¶ 8.]     *113 North Union Avenue*

[¶ 9.] Assessor valued this property at $40,-800 relying on the cost and market approaches. Again Goth criticized assessor's

use of the cost approach as not being accurate. Goth valued the property at $22,000 under the market approach.

[¶ 10.]     *210 North Harth*

[¶ 11.] Assessor valued this property at $51,800 using the cost and market approaches. Goth gave no weight to assessor's calculations under the cost approach reiterating her concerns of the age and large depreciation factors. Instead, Goth relied on the market approach to arrive at a valuation of $24,000.

[¶ 12.] Assessor testified he utilized the "replacement cost new less depreciation tempered against the existing market, so ... a cost approach and the market approach [were used] in deriving the [19]95 assessments" on the properties. Amert provided testimony that the income approach provided a more realistic valuation.

[¶ 13.] Amert raises the following issues for our review:

1.  Whether assessments by Lake County of four real properties for the tax year 1995 were in excess of their true and full value.

2.  Whether the trial court properly entered findings of fact and conclusions of law under SDCL 15-6-52(a).

## STANDARD OF REVIEW

[¶ 14.] As stated in *Richter Enterprises, Inc. v. Sully County*:

> This court's proper scope of review of a trial court's decision in a trial de novo of an assessment matter is whether the decision of the trial court was "clearly erroneous." When applying the clearly erroneous standard, the question is not whether this court would have made the same findings that the trial court did, but whether on the entire evidence this court is left with a definite and firm conviction that a mistake has been committed.

1997 SD 61, ¶ 7, 563 N.W.2d 841, 843 (quoting *Hutchinson County v. Fischer*, 393 N.W.2d 778, 781 (S.D.1986) (citations omitted)).[2] In addition, we must presume that

---

**1.** At the time of this testimony, Goth had a business relationship with Dick Amert. Both Goth

and Amert owned fifty percent interests in Century 21 Midwest Realty in Madison.

**2.** The dissent would affirm on the basis of *Richter*

tax officials act in accordance with the law and not arbitrarily or unfairly when assessing property. *Id.* (citing *Lincoln Township v. South Dakota Bd. of Equalization*, 1996 SD 13, ¶ 5, 543 N.W.2d 256, 257; *Hutchinson County*, 393 N.W.2d at 782). "Taxpayer also has the burden of overcoming the presumption that Director's value was correct" by producing "sufficient evidence to show the assessed valuation was in excess of true and full value, lacked uniformity in the same class or was discriminatory." *Id.* (citations omitted).

## ANALYSIS AND DECISION

[¶ 15.] **1. Whether assessments by Lake County of four real properties for the tax year 1995 were in excess of their true and full value.**

[¶ 16.] Amert claims the assessed valuations of the properties are in excess of their true and full value, lack uniformity in the same class, or are discriminatory and, therefore, violate the South Dakota Constitution, Article XI, § 2.[3]

[¶ 17.] SDCL 10–6–33 concerns the procedure to be utilized in making property valuations:

All property shall be assessed at its true and full value in money. The true and full value is the taxable value of such property upon which the levy shall be made and applied and the taxes computed. In determining the true and full value of property the director of equalization may not adopt

___

and claims that the majority "strain[s] to overrule [*Richter*] without even saying so." The *Richter* decision, however, is easily distinguishable and remains fully intact because there we found it compelling that the taxpayer failed to offer an appraisal different from assessor's valuation "via expert testimony or otherwise." 1997 SD 61 at ¶ 14, 563 N.W.2d at 845. At present, the record contains more than Amert's self serving claims that his property was overvalued. Amert, through two experts, did "produce sufficient evidence to show the assessed valuation was in excess of true and full value, lacked uniformity in the same class or was discriminatory." *Id.* 1997 SD 61 at ¶ 7, 563 N.W.2d at 843.

3. SD Const. art. XI, § 2 provides:

To the end that the burden of taxation may be equitable upon all property, and in order that no property which is made subject to taxation

a lower or different standard of value because it is to serve as a basis of taxation. The director may not adopt as a criterion of value the price for which the property would sell at a forced sale, or in the aggregate with all the property in the third class municipality or district. The director shall value each article or description by itself and at an amount or price as he believes the property to be fairly worth in money. *The true and full value shall be determined by appropriate consideration of the cost approach, the market approach and the income approach to appraisal.* The director of equalization shall consider and document all elements of such approaches that are applicable prior to a determination of true and full value.

(Emphasis added).

[¶ 18.] Amert has provided sufficient evidence that the valuation lacked uniformity which directly contradicts the presumption that assessor's valuation is correct. *Brookings Assoc. v. South Dakota Bd. of Equal.*, 482 N.W.2d 873, 876 (S.D.1992). An assessor must consider each of the three approaches (cost, market, and income) to valuation before making an appraisal. SDCL 10–6–33. While assessor testified he had a "working knowledge" of the subject properties, he admitted he did not personally view the properties in making his assessment. SDCL 10–6–36 provides that the assessor:

shall escape, the Legislature is empowered to divide all property including moneys and credits as well as physical property into classes and to determine what class or classes of property shall be subject to taxation and what property, if any, shall not be subject to taxation. *Taxes shall be uniform on all property of the same class,* and shall be levied and collected for public purposes only. Taxes may be imposed upon any and all property including privileges, franchises and licenses to do business in the state. *Gross earnings and net incomes may be considered in taxing any and all property, and the valuation of property for taxation purposes shall never exceed the actual value thereof.* The Legislature is empowered to impose taxes upon incomes and occupations, and taxes upon incomes may be graduated and progressive and reasonable exemptions may be provided.

(Emphasis added).

[S]hall actually view, *when practicable*, and determine the true and full value of each tract or lot of real property listed for taxation, and shall enter the value thereof in one column, and the value of all improvements or structures thereon in another column, opposite each description of property, also the total value of the same including improvements and structures.

(Emphasis added). Amert's appraiser, Goth, testified as to the importance of viewing property in making a competent appraisal and stated she "wouldn't even try to do an appraisal without looking at [the properties]." Goth testified that properties at issue were unique because they were older homes converted into multi-unit rentals. Goth noted several problem areas that could be detected through physical inspection and result in a change to the properties' valuations including physical deterioration to the interiors and exteriors of some of the properties, possible asbestos wrapping on pipes, possible lead based paint, unstable foundation and outdated electrical and heating services at some of the properties.[4] Amert argues that assessor did not consider functional obsolescence in making his valuation which both testified could only be taken into account by viewing the property.

[¶ 19.] Assessor testified that viewing the 17 Amert properties was not *practicable* due to his extraordinary workload. SDCL 10–6–36. He noted that Amert's properties were only 17 of the 10,000 properties appraised each year in Lake County. Appraiser estimated that although he spent considerably more time with the Amert property valuations, he would have to appraise five properties per hour to complete his duties.

[¶ 20.] Under these circumstances, we believe Amert has provided sufficient evidence as to the importance of viewing this unique property so as to overcome the presumption of correctness. *See In re Jepsen*, 76 S.D. 421, 80 N.W.2d 76 (1956) (holding presumption of correctness does not apply when appraiser does not view property and merely relies on independent appraiser's assessment calculations).

[¶ 21.] The three methods of valuation required to be considered under SDCL 10–6–33 are the cost, market, and income approaches. Each method will be briefly discussed followed by an explanation of the contested valuations for each of the subject properties.

[¶ 22.] Under the cost approach, assessors must "estimate the current construction cost of the improvements, subtract the accrued depreciation, and add the value of the land." Administrative Rules of South Dakota (ARSD) 64:03:01:02.01. When utilizing the cost approach assessors are required to use current versions of the *Marshall and Swift Residential Cost Handbook* and the *Marshall Valuation Service* (Marshall and Swift). *Id.*

[¶ 23.] The second method for determining value is the market or direct sales approach. "An assessor using the market approach to valuation of property shall compare property to similar properties that have recently been sold." ARSD 64:03:01:02.02. Adjustments are then made considering following factors:

(1) Trades, partial interests, personal property, and incomplete or unbuilt community property;

(2) Physical differences and condition;

(3) Financing and assumed leases; and

(4) Date of sale.

*Id.*

[¶ 24.] The final method for determining value is the income approach.

An assessor using the income approach to valuation of property shall estimate the value of a property by determining the present value of the projected income stream. Income and expense analysis builds upon the following components:

(1) Normal unit rent;

(2) Potential gross rent;

4. Lake County points out that Goth conducted her inspection over two years after the challenged assessment and there is no way of knowing whether the defects were present in November, 1994. This argument is without merit as functional obsolescence and many of the defects were present when the structures were built (lead paint, asbestos, heating and electrical systems) and rather than making a valuation determination we are merely concluding the failure to view the properties was sufficient to rebut the presumption of correctness.

(3) Vacancy and collection loss;

(4) Normal gross rent;

(5) Miscellaneous income;

(6) Normal gross income;

(7) Normal expenses; and

(8) Normal net income.

The capitalization rate selected must reflect the proper relationship between the value of the property and the net income it produces. The capitalization rate is composed of an interest rate, a recapture rate, and an effective tax rate.

ARSD 64:03:01:02.03.

[¶ 25.] Assessor utilized a combination of the cost and market approaches in making his valuations of the subject properties. Amert's appraiser, Goth, contends that since all of the subject property are older homes converted into multi-unit rentals, the income approach should have been utilized. In determining "true and full value" of property SDCL 10–6–33 requires that each of the three approaches be considered, not necessarily utilized.

[¶ 26.] Lake County argues that Goth made several errors in making her valuations. Lake County contends Goth's methodology was flawed under the market approach because Goth utilized several of the same comparable homes in each of her valuations. Goth also relied on the figures provided by Amert and used a ten percent capitalization rate in her income approach. Goth admitted at trial that her appraisals improperly considered property taxes as an operating expense and therefore her results were questionable under the income approach. Finally, while Goth indicated she had general appraisal experience, she admitted she had no experience in mass appraisals such as the one used by assessor in 1994.

[¶ 27.] Amert faults assessor for not utilizing the income approach. However, assessor did consider this approach but had a difficult time obtaining information from Amert to complete his calculations. Assessor concluded the information Amert did produce concerning operating expenses was not reliable after attempting to verify several claimed expenses such as heat, utilities, water, and sewer and finding actual expenses were substantially lower than the claimed expenses. Assessor believed Amert had applied costs arbitrarily to each apartment unit so the information supplied by Amert did not present an actual picture of his expenses. Moreover, assessor believed that Amert had incorrectly divided up the total amount of a construction loan equally over all of his properties.

[¶ 28.] A taxpayer cannot be heard to complain on such a point when he has the exclusive access to the needed information and either gives incomplete figures, false figures or no figures at all to the assessor. "[I]f a party has documentary evidence under its control, failure to introduce that documentary evidence at trial justifies the inference that the records of such a party will not support that party's claim." *Sabhari v. Sapari*, 1998 SD 35, ¶ 14, 576 N.W.2d 886, 891, n.6 (citing *Matters v. Custer County*, 538 N.W.2d 533, 536 (S.D.1995)). *See also Klinker v. Beach*, 547 N.W.2d 572, 576, n.2 (SD 1996).

[¶ 29.] Amert also argues the trial court failed to consider a necessary component of depreciation; functional obsolescence.[5] We agree.

Depreciation includes physical depreciation, functional obsolescence and economic obsolescence. The first is wear and tear occasioned by use and the elements. Functional obsolescence is the loss of utility and failure to function because of inadequacies and deficiencies in the property.

---

5. The dissent faults this court's opinion for not identifying a specific finding of fact to be clearly erroneous. However, this proposition clearly misses the point. The issue is the assessor's failure to consider functional obsolescence in determining true and full value. The circuit court accepted Lake County's findings and conclusions verbatim which did not make a specific finding as to functional obsolescence. Amert proposed a finding of fact which brought this to the circuit court's attention by stating:

[I]t is essential to consider ... that each income producing property would be unique in its own functional obsolescence which would affect the ability of that property to produce income, which factors were ignored by [assessor] in establishing said values.

Economic obsolescence is loss of value brought about by conditions in the neighborhood of a property causing loss of business.

*Rau v. Fritz*, 81 S.D. 311, 315, 134 N.W.2d 773, 775 (1965) (overruled on other grounds by *Yadco, Inc. v. Yankton County*, 89 S.D. 651, 659, 237 N.W.2d 665, 670 (1975)).

[¶ 30.] The three types of depreciation used in assessing the market value of property include: "physical deterioration, the wearing out of structures; functional obsolescence, the loss of value due to change in style or design; and economic obsolescence, the loss of value from outside causes, also known as locational obsolescence." *National Food Corp. v. Aurora County Bd. of Comm'rs*, 537 N.W.2d 564, 568 (S.D.1995). Functional obsolescence has been further defined as:

> The need for replacement because a structure ... has become inefficient or outmoded because of improvements developed since its original construction or production. The loss of value due to inherent deficiencies within the property.

*Black's Law Dictionary* 673 (6th ed.1990).

■■■ [¶ 31.] Reduction in valuation for obsolescence is not automatic and must be established in the record by the taxpayer. *See Knodel v. Bd. of County Comm'rs*, 269 N.W.2d 386, 389 (S.D.1978) (citation omitted). Amert's appraiser Goth did provide testimony concerning the poor conditions and declining utility of the properties. Goth concluded several of the properties were nearing the end of their economic life because of the lack of utility for older multi-unit rentals which were split up and divided as Amert's properties were. Furthermore, Goth noted several internal structural defects as well as several areas in each property that were in great need of an upgrade. However, Goth failed to assign a percentage for functional obsolescence in her appraisals. Assessor testified that the depreciation schedule he used incorporated physical depreciation as well as economic obsolescence. However, Lake County admits in its brief that assessor "was not able to personally view the four subject properties and did not have any factors to use for functional obsolescence." *See Brookings Assoc.*, 482 N.W.2d at 877 (finding failure to

include functional depreciation in assessor's appraisal report violated our holding in *Rau, supra* ); *Chicago & N.W. Ry. v. Gillis*, 82 S.D. 470, 148 N.W.2d 581 (1967) (finding the trial court gave insufficient consideration to the evidence of obsolescence in accepting the assessor's cost approach valuation at its stated figure without deduction of any obsolescence resulting in a value in excess of full and true value). Assessor did not have any factors to use for functional obsolescence because he relied on computer printouts rather than making an independent determination for properties he knew from prior experience would probably be debated by the taxpayer.

[¶ 32.] During its oral decision, it is clear the trial court was concerned with assessor's failure to account for functional obsolescence:

> There may or may not be functional obsolescence, and *that [is] determinative on each piece of property*. The court does not have testimony as to functional obsolescence valuations for these pieces of property, and will not depreciate any of these for functional obsolescence.
>
> . . .
>
> [F]or future purposes what the court would recommend ... is if the Amerts believe that there are specific functional obsolescence of properties, like the basement that's out, that [Lake County] be contacted before the assessment is done and go out and look at those specific claims on functional obsolescence to see if the value should be reduced. That would include not just being the basement out, but apartments that are so split up that they are functionally obsolete simply because of the way they were divided up into apartments.

(Tr. 326–27) (emphasis added). Lake County fails to rationally articulate any reason, other than assessor's work load, why functional obsolescence was not and should not be considered. This is not recognized as a statutory exception to the requirement of consideration of this criteria. Lake County also fails to articulate how true and full value can be accurately calculated under the cost approach without considering functional obsolescence. Furthermore, Amert claims the

depreciation schedule used by assessor contained largely single-family, owner occupied homes, rather than multi-unit rentals whose utility may be questioned.

[¶ 33.] Amert's expert, Greg Kaschmitter, an independent real estate appraiser, testified that, assuming the depreciation schedule utilized by Lake County contained mostly single-family owner occupied residences, it would not be appropriate to utilize the depreciation schedule on multi-unit rentals without making further determinations. Assessor conceded that most of the properties included in the local depreciation schedule prepared by his office were single family owner occupied homes.

[¶ 34.] This court acknowledges the increasing taxation burdens on counties to properly assess the growing number of properties within their borders. These growing numbers of properties make mass appraisals and reliance on computers and manuals especially tempting for counties with limited resources. However, the record is unclear as to whether the mass appraisal or any other approach utilized by assessor considered functional obsolescence as required under *Rau and Brookings Assoc., supra.* Amert provided testimony from two witnesses who stated functional obsolescence can only be determined by actually viewing these specific properties. Assessor admitted he did not personally view the properties.[6] Amert provided evidence that at least two of the properties are nearing the end of their economic life because of age and the manner in which the older homes were broken up into apartments.

[¶ 35.] It is clear that neither assessor nor Goth's valuations were free from error. However, based on the entire evidence this Court is left with a definite and firm conviction that a mistake has been committed by failing to consider functional obsolescence as well as the uncertainty concerning the effect of a lack of multi-unit rentals on the depreciation schedule. We consider the second issue to be without merit.

[¶ 36.] Reversed and remanded for further proceedings consistent with this opinion on the functional obsolescence issue.

[¶ 37.] MILLER, C.J., and AMUNDSON and KONENKAMP, JJ., concur.

[¶ 38.] SABERS, J., dissents.

SABERS, Justice (dissenting).

[¶ 39.] I submit that Amert's first issue is no better than his second issue, which the majority opinion dispatches "without merit." I would affirm because Amert has not established that the assessments were in excess of the true and full value of the property.

[¶ 40.] The majority opinion pays lip service to our decision in *Richter Enterprises, Inc. v. Sully County*, 1997 SD 61, 563 N.W.2d 841, the "clearly erroneous" test stated therein, and the presumption in favor of the correctness of the assessments, also stated therein. Each is simply sidestepped in order to reverse and remand.

[¶ 41.] Which of the circuit court's findings of fact are found to be clearly erroneous? The majority opinion specifies *none* by number. Our role on appeal does not include straining to reverse:

> This court's proper scope of review of a trial court's decision in a trial de novo of an assessment matter is whether the decision of the trial court was "clearly erroneous." When applying the clearly erroneous standard, the question is not whether this court would have made the same findings that the trial court did, but whether on the entire evidence this court is left with a definite and firm conviction that a mistake has been committed.
>
> Furthermore, there is a presumption that tax officials act in accordance with the law

---

6. The Legislature recognized that it is not practicable for an assessor to annually view every taxable parcel in the county. Thus SDCL 10–6–36 requires such a personal inspection only "when practicable." Nevertheless both experts who testified for Amert were of the opinion that when preparing for trial and when functional obsolesce is an issue, an expert cannot express an opinion without the foundation of a personal inspection. County does not call to our attention any other method of gaining this necessary background information. Such an inspection does not have to be done by the assessor personally but is foundational for any expert testimony on the subject presented by the County.

and not arbitrarily or unfairly when assessing property. *Taxpayer also has the burden of overcoming the presumption that Director's value was correct. Specifically, Taxpayer must produce sufficient evidence to show the assessed valuation was in excess of true and full value, lacked uniformity in the same class or was discriminatory.*

*Richter,* 1997 SD 61 at ¶ 7, 563 N.W.2d at 843 (emphasis added) (citations & internal quotations omitted).

[¶ 42.] The assessor testified that "the depreciation schedule he used incorporated physical depreciation as well as economic obsolescence." The majority opinion purports to reverse the trial court for the claimed failure to consider functional obsolescence. The burden to establish functional obsolescence is on the *taxpayer,* not on the assessor, nor the trial court. *Knodel v. Board of County Comm'rs,* 269 N.W.2d 386, 389 (S.D. 1978). Amert, the taxpayer, failed to establish functional obsolescence and the circuit court so found.[7] *See* ¶ 32 ("The [circuit] court does not have testimony as to functional obsolescence valuations for these pieces of property....").[8]

[¶ 43.] As noted by the majority opinion, Amert's appraiser failed to assign a percentage for functional obsolescence. It is a well-settled principle of law that the taxpayer cannot overcome the presumption of correctness of the assessment without providing a contrary valuation. *See Richter,* 1997 SD 61 at ¶ 14, 563 N.W.2d at 845; *see also Poindexter v. Hand County Bd. of Equalization,* 1997 SD 71, ¶ 26, 565 N.W.2d 86, 92–93:

[Taxpayer] offered no proof to show the valuation was unfair. There was no showing that the assessed valuation of his land exceeded the actual value of the land. In fact, he testified that he never independently established a market value on the land. Therefore, Poindexter did not meet his burden as defined by this court. *See Lincoln Township v. South Dakota Bd. of Equalization,* 1996 SD 13, ¶ 26, 543 N.W.2d 256, 260 (stating that presumption of correctness cannot be overcome without an appraisal showing the assessment was erroneous) (citing *Knodel,* 269 N.W.2d at 389; Roseland v. Faulk Cty. Bd. of Equalization, 474 N.W.2d 273 (S.D.1991) (presumption overcome by evidence of excessive valuation, which was demonstrated by evidence of three instances where the assessed value of Faulk County agricultural property exceeded its actual value)).

[¶ 44.] In spite of Amert's obvious failure to meet this burden, the majority opinion misinterprets the trial court's recommendation to *Amert of a procedure to be used in the future.* ¶ 32. *See Richter,* 1997 SD 61 at ¶ 17, 563 N.W.2d at 845 ("Taxpayer's assertion regarding economic obsolescence is based on conjecture, which is insufficient to demonstrate the circuit court erred."). The trial court correctly pointed out the flaw in Amert's appeal of his assessments.

[¶ 45.] Additionally, Amert states in his brief that he attempted to avoid an appeal by providing Lake County with all relevant information prior to the assessments. Appellant's Br. at 8. If functional obsolescence was a factor he wanted considered, he obviously could have, and should have, timely conveyed that factor to assessor.[9] By remanding, we are incorrectly providing Amert a second bite of the apple.

[¶ 46.] We should affirm based on *Richter* and not strain to overrule it without even saying so.

---

7. If functional obsolescence (loss of use) really existed, it could have been, but was not, shown in the records of the properties' income.

8. Even though the circuit court expressly stated there was no testimony as to functional obsolescence valuations, the majority opinion manages to find that functional obsolescence was present when the structures were built. ¶ 18 n. 4.

9. The majority faults assessor for not personally inspecting the property *in preparation for trial.* ¶ 34 n. 6. We are supposed to be reviewing the *assessment,* not factors or events such as trial strategies occurring two years after the fact. Under that analysis, "the burden [of proof] is impermissibly shifted from the taxpayer to the director of equalization." *Sabow v. Pennington County,* 500 N.W.2d 257, 260 (S.D.1993).